569 A.2d 337

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Levi SMITH, Appellant.**

Supreme Court of Pennsylvania.

Argued Jan. 17, 1989.

Decided Feb. 1, 1990.

John W. Packel, Philadelphia, Chief, Appeals Div., Leonard N. Sosnou, for appellant.

Gaele McLaughlin Barthold, Deputy Dist. Atty., Ronald Eisenberg, Philadelphia, Chief, Appeals Div., Karen Grigsby, for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA, PAPADAKOS, and STOUT, JJ.

## OPINION OF THE COURT

PAPADAKOS, Justice.

Appellant raises two issues for our review: (1) whether he was deprived of a speedy trial guaranteed by Pa.R.

Crim.P. 1100 as well as by constitutional requirements; and (2) whether the trial court erred in admitting into evidence a weapon recovered from his coat pocket.

Appellant and a confederate were arrested on January 4, 1985, and charged with the pistol-beating robbery of $200.00 from a garage attendant. Appellant Smith was tried by a jury on July 16, 1986, and a verdict of guilty was returned on each of the charges of robbery, possession of instruments of crime, and criminal conspiracy. He was sentenced to prison for concurrent terms of twenty-eight months to fifty-six months each for robbery and possession of instruments of crime. An additional three years probation (consecutive) was imposed for criminal conspiracy. Appellant also was directed to receive psychiatric treatment for alcoholism and related problems tied to his record of violent crimes.

## A. Speedy Trial Issue

The first issue to be considered is whether the judicial delay of 555 days between his arrest and trial constitutes a violation of his speedy trial rights. At all times, it should be emphasized, the delays in this case were caused by back-logged, individualized court calendars. Appellant specifically urges us to find that the length of the delay is itself improper and is exacerbated further by his allegation that his case could have been assigned to other, less-occupied jurists for earlier trial, thereby making the delay even more indefensible under the law.

The mechanical run date for trial was July 1, 1985. Following his arrest, however, there were two brief delays prior to the preliminary hearing on March 15, 1985. The case was assigned to Judge Eugene H. Clark who, on April 11, 1985, determined that because of the unavailability of a defense counsel until June 3, 1985, the case would be put in his ready pool for trial on that date. When it became apparent that Judge Clark's docket was overcrowded and would prevent the case from being heard on June 3, 1985, the Commonwealth filed a timely and successful motion to extend.

On December 18, 1985, Appellant filed a Petition for Habeas Corpus, alleging a violation of his speedy trial rights. An evidentiary hearing then was held on January 17, 1986, before Judge William J. Mazzola who denied the petition after deciding that the failure to try the case was excusable because of the backlog of Judge Clarke's caseload. Judge Mazzola also established that the case likely would be heard in the period May–July, 1986. The case then was reassigned to Judge Moss.

Although Judge Moss held a pre-trial conference on May 23, 1986, she listed the case for June 18, 1986, her earliest open date. On that date, nevertheless, the judge's calendar once again forced a continuance of the trial until July 14, 1986, when a suppression hearing finally was held, and once again Appellant's motion to dismiss on Rule 1100 grounds was denied.[1] Trial began on July 16, 1986. There is no dispute on the record that the Commonwealth filed timely motions to continue at each required point in this case.

Here the Commonwealth was duly diligent in its own efforts, but the delay was beyond its control. Our review, therefore, concentrates on the question of whether the trial court violated Appellant's speedy trial rights.

Rule 1100 was adopted by us in *Commonwealth v. Hamilton*, 449 Pa. 297, 297 A.2d 127 (1972), pursuant to our supervisory powers. According to *Hamilton*, the rule is intended to reduce the backlog of cases awaiting trial and to "formulate a rule of criminal procedure fixing a maximum time limit" to bring an accused to trial. *Id.*, 449 Pa. at 308, 297 A.2d at 133. *Hamilton* thereby explicitly incorporated the "fixed time" proviso of *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101, 116 (1972). The mandatory time requirement was designed to encourage both the prosecution and the judiciary to act promptly in criminal cases and to establish an objective time limit for their guidance.

---

**1.** Although bail was reduced, Appellant still lacked enough funds to pay. He also remained in jail on a probation violation retainer throughout these proceedings. His sentence reflected time served.

The apparent simplicity of a 180–day rule, nevertheless, has been belied over the years by repeated efforts on the part of our judiciary to define with any precision just how long is too long and which factors count in tolling the legal odometer. In the case at bar, we are asked by the Appellant to find that the trial court failed to reassign the case in a speedy manner but rather adhered to an excessive degree to a rigid, backlogged, individualized calendar system.[2]

We are being asked to find, furthermore, that lengthy delays beyond the prescribed period which are caused by court congestion violate the provisions of the speedy trial rule. In support of his contention, Appellant points to the fact that following administrative assignment of his case to Judge Moss, he was tried promptly. His obvious point is that the reassignment should have occurred early enough to satisfy the rule and that such a lengthy delay as did occur cannot be justified.

The rule in this Commonwealth, which we are being urged to overturn, is that our courts are under no obligation to rearrange their dockets in such circumstances. Our seminal case on this subject is *Commonwealth v. Mayfield*, 469 Pa. 214, 364 A.2d 1345 (1976), which was based both on *Hamilton* and *Barker v. Wingo*. Adopting first the A.B.A. recommendation that calendaring of cases lies within the power and responsibility of the trial court, the *Mayfield* court rejected the Superior Court's decision that any judicial delay was per se error:

> The Superior Court, concluding that rule 1100 was intended to promote prompt action by the courts as well as by the prosecution, held that delays attributable to court administration could never justify an extension under rule 1100(c). The rule, however, was not intended to create

2. The individual judge calendar system was in use at the time of this trial. It had been adopted in 1983 at the direction of the late Chief Justice Samuel T. Roberts. In May, 1986, two months before the instant trial took place, the Administrative Judge (sic) of the Court of Common Pleas of Philadelphia County established a ready pool of the oldest major felony cases involving jailed defendants represented by private counsel. The ready pool system subsequently totally replaced the individual judge calendar system.

such an inflexible result. This Court is aware that, despite diligent efforts by the trial courts, cases may arise when a trial of a defendant cannot be held within the prescribed period. In such circumstances, the policies which prompted the adoption of rule 1100 would not be served by disallowing a reasonable, limited exception specifying "the date or period within which trial shall be commenced." Pa.R.Crim.P. 1100(c). The rule recognizes that "due diligence" is the most that should be demanded from the prosecutor and that if despite such efforts, he cannot prepare for trial within the prescribed period, an extension is permissible. No more rigid result under our present rule is justified when the inability of a trial court to proceed within the prescribed period is at issue.

469 Pa. at 220, 364 A.2d 1345.

*Commonwealth v. Crowley,* 502 Pa. 393, 466 A.2d 1009 (1983), later also construed *Mayfield* as not requiring an exhaustion of "the possibility of rearranging overcrowded dockets to accommodate Rule 1100 run dates." Moreover, although a court must cite the reasons for its delay, the majority concluded that:

A rigid requirement that the Courts of Common Pleas, particularly in urban areas with severely crowded criminal and civil dockets, must continually arrange and rearrange their schedules to accommodate the 180 day rule, would be ill-advised.

It may be possible, in an abstract sense, to arrange a crowded court calendar to insure that every criminal defendant is tried within 180 days. However, such a rigid system requires eliminating a realistic mechanism for scheduling civil cases, or giving weight to those who await trial in prison for lack of bail.

*Id.,* 502 Pa. at 400–401, 466 A.2d 1009.

Any per se rule:

Ignores the realities of crowded criminal and civil dockets which overburdened Common Pleas courts must deal with on a day-to-day basis. Rule 1100 was designed to promote the administration of criminal justice within the

context of our entire judicial system, not to render that system hostage to its own closed logic. The goals of efficiency and ease of administration which Rule 1100 serves are worthy; they should not be exalted at the expense of justice. Thus, in interpreting our Rule 1100, we must throw away the stopwatch and pick up the scales of justice. *See, e.g., Commonwealth v. Blady,* 492 Pa. 285, 424 A.2d 864 (1980) (dissenting opinion, Larsen, J., in which Flaherty, J. joined).

Rule 1100 should not be construed to require Common Pleas Courts with backlogged criminal dockets to devote all their administrative and judicial resources to guarantee that every defendant is tried within the period prescribed by the Rule. It should be sufficient for the court to establish that it has devoted a reasonable amount of its resources to the criminal docket and that it scheduled the criminal trial at the earliest possible date consistent with the court's business. (Citations omitted).

*Id.,* 502 Pa. at 402–403, 466 A.2d 1009.

In *Commonwealth v. Terfinko,* 504 Pa. 385, 474 A.2d 275 (1984), we reached a similar determination by following these precedents. As noted, we have rejected all suggestions that under our law the trial court must demonstrate that another judge could not have heard the case before the run date.

In addition to asserting that the Commonwealth did not comply with Rule 1100, Appellant also alleges that the length and reasons for his pre-trial delay and ensuing prejudice violated his speedy trial rights under Article I, section 9 of the Pennsylvania Constitution and the Sixth Amendment of the Federal Constitution. Such an inquiry is necessary because although Rule 1100 was designed to implement the right to a speedy trial as required by *Hamilton,* constitutional guarantees under *Barker* continue to provide a separate basis for asserting a claim of undue delay. *Jones v. Commonwealth,* 495 Pa. 490, 499, 434 A.2d 1197, 1201 (1981).

In determining whether the right to a speedy trial has been violated, *Barker v. Wingo* demands that the conduct of both sides in a criminal trial must be balanced in light of four factors: the length of the delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant. No one factor is dispositive and "courts must still engage in a difficult and sensitive balancing process." *Id.*, 407 U.S. at 532, 533, 92 S.Ct. at 2192, 2193, 33 L.Ed.2d at 117, 118. The length of delay constitutes a "triggering mechanism," but unless the delay "is presumptively prejudicial there is no necessity for inquiry into other factors that go into the balance." Moreover, the reasons used to justify the delay play a critical role in the balancing test, and "overcrowded courts should weigh less heavily" against the prosecution. *Id.*, at 531, 92 S.Ct. at 2192, 33 L.Ed.2d at 117. Finally, there must be an accounting given for the prejudice which accrues to the defendant because of the delay.

Here the delay of one and one-half years was caused by choked trial dockets. The length of the delay itself, of course, is not dispositive. In *Barker v. Wingo,* a five-year delay did not result in dismissal of the complaint. In *Commonwealth v. Ware,* 459 Pa. 334, 329 A.2d 258 (1974), we justified twenty-six months of "unexplained and unexcused" delay. Also see, *Commonwealth v. Glover,* 500 Pa. 524, 458 A.2d 935 (1983) (four year delay); and *Commonwealth v. Cooley,* 484 Pa. 14, 398 A.2d 637 (1979) (delay of three and one-half years). As to the specific reason for the delay, we concluded on point in 1981 in *Jones v. Commonwealth,* that "the delay lasted two and one-half years was ... simply an unfortunate consequence of backlogs in the judicial system." 495 Pa. at 497, 434 A.2d 1197. Balancing the length of delay in the instant case with the reasons for it does not provoke us at this time into changing our rules.

Appellant Smith argues further that he was prejudiced because an alibi witness (his sister) could not recall on cross-examination what food and medicine she had served him on the night of the robbery (T.T., 7/17/86, p. 21). He

also complains about the alleged general lack of detail and consistency in her testimony (T.T., 7/17/86, pp. 5–9), all of which could have been due to a loss of memory caused by the passage of time.  As we stated in *Glover*, prejudice arising from an impairment of the defense surely is the most serious of the *Barker v. Wingo* factors, since it directly affects the fairness of the trial.

Appellant now contends in this vein that his sister's inability to remember such details as the type of food served or aspirin given to him for a pulled tooth rendered her alibi statement less credible, leading to prejudice.  We find that line of defense implausible and agree with the reasoning of the Superior Court:  these matters were not crucial to the jury's determination of whether her brother was at home on the night of the crime.  Her admission of a lack of memory as to those details is neither unusual nor does it vitiate the fact that she emphatically did remember his presence.  There is no clear evidence of prejudice to the Appellant on this record.

## B.  Suppression of the Gun

Appellant's second claim of error is that the weapon introduced at trial was seized without a proper warrant and was not in plain view of the officers who were seeking to arrest him in his sister's home.

Appellant frames the question, in two parts, as follows: The relevant facts indicate that an arrest warrant was issued commanding that Appellant be taken into custody if he be found in the Commonwealth.  *The police went to the sister's home*, where Appellant resided, at 7:00 a.m., in order to intercept him before he went off to work.  The sister admitted the police into her home and told them that Appellant had gone to work.  Disbelieving her, the officers decided to search the house.  One detective proceeded to steps leading to the basement, and there he brushed up against several coats hanging in the stairwell.  The coats fell to the steps.  As the officer returned up the stairs from the basement, he picked up the coats, including Appellant's brown suede coat, noticed an unusual feel and weight

suggesting a weapon, reached in the pocket and pulled out a gun which was fully loaded (T.T., 7/16/86, pp. 149–152). The defendant's sister told police that the coat was her brother's and that the gun was hers, which, it was later verified, she had reported stolen (T.T., 7/15/86, p. 13). The police kept the gun.

Failing to find Appellant in their initial search, the police returned to the same address at 1:00 p.m. when, on this occasion, they found and arrested Appellant. According to police testimony, Appellant admitted that he owned the brown suede coat and wore it to police headquarters (T.T., 7/15/86, pp. 151–163). The gun was admitted by the court as evidence of armed robbery.[3]

The Superior Court concluded in an unpublished memorandum opinion that the seizure of the *gun* was lawful under the plain view doctrine: "In the instant case, the weight of the coat and 'feel' of the pocket were sufficient to place the gun within the plain view of the officer." By contrast, Appellant argues that his Fourth Amendment rights were violated because the police were not lawfully on

**3.** The victim garage attendant could not identify the weapon in evidence as the one used on him on the night of the crime (T.T., 7/16/86, p. 85). At the suppression hearing (S.T., 7/14/86, p. 62), the following testimony was given by the officer who found the gun:

A. We had an arrest warrant and proceeded to search the residence for him. I started to go to the basement, and on my way down there's hooks there where you hang your clothes from when you come in from the outside. I knocked several of those coats down. Okay. As I was picking them up to hang them back up, I noticed a gun in, I believe it was a brown suede jacket. The sister at that time related to me it was her brother's coat and she was quite surprised that the gun was there.

Q. What did she tell you about the gun?

A. She had reported that gun stolen sometime earlier. I don't remember the exact date, but I know that she had, she stated she had reported the gun stolen, and later on I checked it out and found out that she did, in fact, have a police report on it.

Q. What type of weapon was it?

A. It was a small .22 caliber automatic, silver in color. I believe it had brown grips.

Q. And do you know, of your own knowledge, what type was used in the robbery of this case?

A. I believe that it was described as that type of weapon.

the sister's premises, the gun was not in plain view, and the police officer lacked probable cause to seize the weapon.

Our initial consideration is whether the police had a legal right under the warrant to search for Appellant in his sister's home.[4] Appellant argues that neither the courts below nor the Commonwealth has been able to determine why the police went to the sister's house, while the address on the warrant was the Appellant's home. Appellant specifically concludes that his constitutional rights were violated because "there was no evidence whatsoever offered by the Commonwealth at the suppression hearing to establish that there was a reason for the police to believe that the defendant was inside his sister's residence" prior to their first entry. The issue is crucial because the arrest warrant must provide the location where the actor is being sought, or the police must have reason to believe that the Appellant is within the premises to be searched for him. Such a safeguard prevents the authorities from engaging in blanket or house-to-house searches which, in effect, amount to an infamous general warrant based on unfettered police discretion. *Steagald v. United States*, 451 U.S. 204, 220, 101 S.Ct. 1642, 1652, 68 L.Ed.2d 38, 50 (1981).

Our interpretation of this standard for an arrest at a different location than that shown on the arrest warrant is whether the police have "reason to believe" the suspect could be found there. Our case on point is *Commonwealth v. Stanley*, 498 Pa. 326, 333, 446 A.2d 583, 586 (1982):

A valid arrest warrant and mere "reason to believe" that appellant was within was all that the police needed to enter. More stringent requirements—a search warrant or probable cause—were wholly unnecessary.

The police appear to have questioned an anonymous relative of the Appellant prior to the arrest, but there is nothing on the record to show that the police thereby were pointed

---

4. The arrest warrant specified "Levi Smith, 2955 N. 12th Street;" the sister's address where the arrest took place is 2838 N. Watson Street. Appellant insists that because of this difference, the police had no right to be at his sister's home.

towards the sister's house. (N.T., 7/14/86, p. 40). Appellant is correct, therefore, in concluding that the Commonwealth produced not one "scintilla of evidence of record justifying a belief by the police" that he could be found there.

In spite of this, however, the Appellant's arguments must fail because he did not raise the issue in suppression, trial or post-trial motions.

MR. KELLY: Well, I'm sure Mr. Smith knows that we're trying to do here, Your Honor.

THE COURT: I just want him to state that he understands the basis for your motion.

MR. KELLY: Mr. Smith, we're trying to suppress three things, the out-of-court and in-court identification of you by Michael Nelson and a .22 caliber Jennings semi-automatic pistol, which was found at your residence, and a statement which you made to the detective.

We have discussed these things before, haven't we?

THE DEFENDANT: Yes.

(S.T., 7/14/86, p. 17).

No other statement referring to the discrepancy over the address appears in the suppression record.[5] Efforts to

5. The only other reference to the issue of the search of the sister's home appears at S.T., 7/14/86, p. 71, where defense counsel noticeably did not delve into the matter:

BY MR. KELLY:
Q. Didn't you think that was important, detective?
A. Well, I think that's just as important as the fact that he was in that particular house where he lived when we apprehended him. That's important too. That's the address I believe that's on the warrant.
Q. May I see the *search* warrant for the residence?
A. The *search* warrant for the residence?
Q. Yes.
A. I don't know if there is a *search* warrant for the residence.
Q. Did you fill out the property set for the weapon?
A. No, sir.
Q. Why not?
A. I gave that to Det. Troutner.
Q. Why didn't you do it?
A. Because I was busy doing other things, counsellor.

suppress the weapon never were predicated in any articulated manner on the issue of whether the police were lawfully on the premises. An identical void exists in the trial record, while post-verdict motions included only the following: [6]

4. The Court erred in failing to suppress the pistol taken during the warrantless search of petitioner's dwelling.

The motion was not argued further on the issue of the police being lawfully there. Since the Appellant did not properly challenge the right of the officers to be at his sister's home, we are required to conclude that the constitutional question has been waived. *Commonwealth v. Berrios*, 495 Pa. 444, 434 A.2d 1173 (1981); *Commonwealth v. Goggans*, 455 Pa. 606, 317 A.2d 222 (1974).[7] In order to raise any objection, the defendant must give a specific reason. *Commonwealth v. Austin*, 484 Pa. 56, 398 A.2d 941 (1979). It is significant that throughout every critical stage of the proceedings, all the participants, Appellant, his counsel, his sister, the police, the prosecutor, and the judge never questioned the fact that the police had gone to *his residence.*

We turn next to the question of the seizure of the gun. Here the coats were knocked accidentally from their hooks, and the officer was picking them up when by the feel and weight he was able to determine that the coat pocket contained a gun. The relevant testimony is as follows:

BY MR. KELLY:

Q. You found this brown suede jacket, right? That was the last coat you picked up?

A. Yes.

Q. And you were hanging that on the hook?

(Emphasis added—no attempt to examine the *arrest* warrant was ever made.)

---

6. The post-verdict motions filed on July 25, 1986, were denied by Judge Moss on January 3, 1987.

7. The trial court opinion, as expected, made no reference to the issue. The Superior Court did address the matter and rejected Appellant's arguments.

A. That's right.

Q. Then you discovered the gun?

A. When I picked it up, I discovered the gun.

Q. You picked it up?

A. Yes.

Q. Did you see it?

A. I felt it.

Q. You felt it with what, your hand?

A. Yes.

Q. Not the weight of the jacket?

A. I felt the weight, I grabbed it and I realized it was a gun that was in there.

Q. Pick up that gun for a second, detective, would you, please?

A. Sure.

Q. How much does that weigh?

A. I don't know, but I could certainly tell it's a gun, whether it's in the pocket or whether it's sitting right there. I can tell.

Q. Do you have any idea how much it weighs?

A. No, I don't.

Q. It weighs a lot less than the revolver you carried while on duty, doesn't it?

A. Not a lot less, no.

█ It is clear from the record that the finding of the gun was inadvertent. In picking up the coat which he had accidently knocked off the hook, he sensed the presence of what he reasonably believed to be a gun in a pocket of the coat. The law has long recognized the sensitive feel of police officers in permitting them to seize weapons which they have found in "frisk" cases. A "frisk" is a search that involves contact or patting down of outer clothing to detect concealed weapons. In such cases we have never questioned the ability of the police to recognize the existence of a concealed weapon based upon their sense of feel.

There seems to be no reason to question the ability of the officer in this case from sensing that the coat he was lifting

off of the stairs contained a gun in one of the pockets. Coupled to his awareness that a gun had been used in the robbery, he was motivated properly to search the garment and retrieve the weapon. He seized the gun when the sister identified the coat as Appellant's.

Even though there was no pre-existing cause to search that particular item when he entered the home, subsequent events altered the circumstances. Under those changed conditions, the officer could not have been expected to ignore the distinct possibility of the existence of this evidence. The facts, in effect, deprived him of any discretion: any reasonable person would have seized the evidence. His intrusion into the coat, therefore, was a reasonable inference in all respects and justifiable as an exception to the requirement of probable cause. The officer was able to point to articulable facts and the rational inferences he drew to warrant the intrusion. *Commonwealth v. Fassett*, 496 Pa. 529, 437 A.2d 1166 (1981); *Commonwealth v. Murray*, 460 Pa. 53, 331 A.2d 414 (1975).

We, therefore, conclude that the search of the coat, in the absence of the presence of the defendant and without any ransacking or dragnet search of the house, was a minor intrusion when balanced against the government's need to seize weapons under these very restricted and compelling circumstances.

The judgment of sentence is affirmed.

STOUT, former J., did not participate in the decision of this case.

NIX, C.J., files a dissenting opinion in which ZAPPALA, J., joins.

NIX, Chief Justice, dissenting.

The probability of the guilt of a defendant does not provide license to trample upon that person's constitutional rights. Here there was a flagrant violation of appellant's Fourth Amendment rights. The police went to the home of appellant's sister, 2838 N. Watson Street, armed with an

*arrest* warrant specifying "Levi Smith, 2955 N. 12th Street." The warrant, as written, authorized entry into appellant's North 12th Street residence. In order for entry into the sister's home to have been appropriate under these facts, there must have been reason to believe appellant was inside the sister's home. The majority appropriately cites to *Steagald v. United States*, 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981); and *Commonwealth v. Stanley*, 498 Pa. 326, 446 A.2d 583 (1982), for the above standard for an arrest at a different location from that shown on the arrest warrant and concedes no evidence was offered by the Commonwealth to justify a belief by the police that defendant could be found in his sister's home.[1] Entry into the sister's home to arrest the defendant, implicitly acknowledged by the majority to be unauthorized even if deemed waived, may not be used to justify a warrantless search of clothing in the sister's house. The fact is that the police officers were illegally on the premises when one of them "accidentally" knocked down several coats as they descended the cellar steps while looking for the appellant. After determining that appellant was not on the premises, one of the officers attempted to repair the damage resulting from his intrusion into the lady's home by graciously replacing the garments on the hook from which they had been dislodged.

At this juncture, it must be emphasized that the warrant which was used to secure entrance into the home was a *warrant of arrest* of a specific person who, at that point the police knew, was not on the premises.[2] The testimony the Commonwealth asserts to justify the search is that the officer noticed one of the jackets (which belonged to appellant) was of unusual weight, and by feeling the pocket determined that a gun was probably contained therein. The

**1.** The majority's statement "the appellant resided in his sister's home", p. 341, is contradicted by the concession there was no evidence to justify a belief the defendant could be found in his sister's home.

**2.** At the point when the officers knew the defendant was no longer on the premises, there was no longer a reason for them to remain in the house.

majority characterizes this search as an "inadvertent" finding[3] and seeks to justify the warrantless search of the lady's home by resort to the "stop and frisk" search doctrine.

The majority's application of the "stop and frisk" doctrine in this case is erroneous. Under that doctrine, first enunciated in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and *Sibron v. New York,* 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968), an officer, prior to making any search of an individual's *person,* must have observed such an unusual and suspicious conduct on the part of the person who is *stopped* that he may reasonably conclude criminal activity is afoot and the person with whom he is dealing may be armed and dangerous. In both *Commonwealth v. Fassett,* 496 Pa. 529, 437 A.2d 1166 (1981), and *Commonwealth v. Murray,* 460 Pa. 53, 331 A.2d 414 (1975), on which the majority relies, automobiles were involved. In both *Fassett* and *Murray* police officers caused the driver of an automobile to stop. As I stated in *Murray:*

> The United States Supreme Court in *Terry, supra* and in *Adams v. Williams,* 407 U.S. 143, 92 S.Ct.1921, 32 L.Ed.2d 612 (1972), has suggested that even in the absence of probable cause there may be, under certain circumstances, justification for a limited intrusion upon the privacy of an individual. Under these decisions the Court has suggested that a brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining additional information may in fact be reasonable although the officer at that time did not possess probable cause that would justify an arrest. *In the Terry, supra and Adams, supra decisions, the Court was required to struggle with the balancing of the right of society and the right of an individual in street encounters. Because a motorist's extreme mobility may otherwise al-*

---

**3.** The facts as related by the officer who found the gun are remarkably similar to the facts of a "pat down" search except for the crucial point that here the garment searched was not being worn when "patted" or felt.

*low him to avoid police confrontation, the State has an equally strong interest in these cases in stopping a moving vehicle to freeze momentarily a situation of suspected criminality.* However, these decisions have made it clear that to justify the intrusion the police officer must be able to point to specific and articulable facts which taken together with rational inferences from those facts reasonably warranted the intrusion.... (Citations omitted.)

Thus, it is also clear that an investigative stop of a moving vehicle to be valid must be based upon objective facts creating a reasonable suspicion that the detained motorist is presently involved in criminal activity. (Emphasis added.)

460 Pa. at 61, 331 A.2d at 418.

The "specific and articulable facts which taken together with rational inferences from those facts reasonably" warranting intrusion, referred to in *Terry* and rearticulated by me in *Murray*, are not the type of facts present in this case. There is no issue of a motorist's extreme mobility nor a case of freezing momentarily a situation of suspected criminality. The urgency extant in "stop and frisk" cases was not present here. This is clearly a case of an illegal entry into someone's home, followed by an illegal search of appellant's clothing found in that home which produced poisoned fruit.

Finally, when holding that the doctrine of the "stop and frisk" cases warrants the admissibility of the evidence produced by the unlawful entry, search and seizure occurring here, the majority does violence to a fundamental aspect of *stare decisis* —the facts must be substantially the same when applying a principle of law previously enunciated.

I am compelled to dissent.

ZAPPALA, J., joins in this dissenting opinion.