564 A.2d 216

COMMONWEALTH of Pennsylvania

v.

Joseph McLEAN, Appellant.

Superior Court of Pennsylvania.

Submitted April 25, 1989.

Filed Aug. 31, 1989.

John B. Elbert, Philadelphia, for appellant.

Donna G. Zucker, Asst. Dist. Atty., Philadelphia, for Com., appellee.

Before McEWEN, OLSZEWSKI and MELINSON, JJ.

OLSZEWSKI, Judge:

Following a conviction by a trial jury for rape and false imprisonment and concurrent sentences of four to ten years and six months to one year incarceration respectively, appellant now asks us to vacate his sentence and order a new trial. We take up the following issues: (1) whether the trial court erred when it (a) precluded questions concerning the relationship between appellant and victim, when it (b) charged the jury on the requisites for common-law marriage, and when it (c) opined as to the sufficiency of some of the evidence; (2) whether the trial court erred in allowing alleged hearsay in the form of a police radio call; (3) whether the prosecutor made prejudicial statements in his closing; and (4) whether there was ineffective assistance of prior counsel for failing to object to a supposedly improper statement during the trial court's jury charge. Because we find merit insufficient to honor appellant's request, we affirm the trial court's judgment of sentence.

Trial counsel was able to make contemporaneous objections concerning the alleged trial court error asserted here.

Appellant also included the issues raised here in his post-verdict motions and his supplemental post-verdict motions. Therefore, appellant has successfully preserved these issues on appeal.

On an early morning in November 1987, appellant used scissors to threaten complainant Alicia Vaughn ("Vaughn") to have sexual intercourse with him in his apartment in Philadelphia. After appellant penetrated Vaughn and climaxed, he drove her back to her sister Chiquita Vaughn's ("Chiquita") house where she had been living. Earlier, around midnight, appellant had confronted Vaughn on the street outside her sister's home and after a brief exchange, grabbed her, pulled her, hit her on the face, took her car keys, got her car, threw her into the car while she resisted, and drove to his apartment. Once there, appellant alternately pulled and dragged Vaughn into the row home and up the stairs to his bedroom.

At 1:00 a.m., Chiquita contacted the police to report her sister missing. Officer Jacobs was dispatched to inquire and advised Chiquita as to the proper procedure. An hour or so earlier, Officer Jacobs had been summoned to an area near Chiquita's house to respond to a radio call that a woman was screaming.

After appellant dropped her off at Chiquita's house, Vaughn contacted the police and reported the incident. Officer Jacobs again responded and took down Vaughn's complaint. The police, pursuant to a warrant, on entering appellant's apartment, found appellant threatening to kill himself. For six and one-half hours, appellant held off the police until they used force to overcome him.

For five years Alicia Vaughn and appellant had an intimate relationship which produced two children. During that time, Alicia Vaughn for months at a time lived either with appellant at his apartment or with Chiquita. Two months before the incident, Vaughn had ended the relationship and "moved out" of appellant's apartment back to her sister's house. (N.T. 3/3/88, 96).

During trial, appellant's counsel asked certain questions in an effort to bring out the nature of the relationship

between appellant and Vaughn. His purpose was to show that a common-law marriage existed between them. Such a marriage would preclude application of the rape statute which excludes spouses from its purview. 18 Pa.C.S.A. § 3121 (see discussion below). On cross-examination of Vaughn, he asked:

> [APPELLANT'S COUNSEL] Now, when you said you were close to his family, did they treat you as if you were married to him?
>
> THE COURT: I don't know what that means.... I don't know what you're trying to do here. I don't understand that, "Did they treat you—....
>
> [APPELLANT'S COUNSEL]: This goes to the elements of the crime.
>
> THE COURT: Elements of what crime? Proceed, please. This is way off target.

(N.T. 3/3/88, 136–137).

> On cross-examination of Chiquita, he asked:
>
> [APPELLANT'S COUNSEL]: How long have you known him?
>
> A: Personally, it really was just the last few months. I know of him. I knew that [he] was my sister's boyfriend, but we wasn't really close.
>
> Q: Were you [sic] he and your sister living together what they call common-law?
>
> A: Was him and my sister living together?
>
> Q: Yes.
>
> [COMMONWEALTH]: I'm going to object to that question.
>
> THE COURT: I'll sustain the objection.
>
> [APPELLANT'S COUNSEL]: Were they living together as husband and wife?
>
> THE COURT: She's already testified, and she knew them as a boyfriend/girlfriend.

(N.T. 3/3/88, 196–197).

On cross-examination of Phinezeze Jones ("Jones"), appellant's landlord, he asked:

[APPELLANT'S COUNSEL]: Do they live in that room as man and wife?

A: Yes.

[COMMONWEALTH]: Objection.

THE COURT: Sustained. That's stricken.

[APPELLANT'S COUNSEL]: It's an element of the crime, sir.

THE COURT: I said sustained.

[APPELLANT'S COUNSEL]: Yes, sir.

(N.T. 3/4/88, 24).

Finally, in this same area of inquiry, during cross-examination of Vaughn, he asked whether she had received payments to support their children. He asked a similar question during cross-examination of Chiquita. The trial judge prevented such questioning because it was irrelevant. (N.T. 3/3/88, 169–170, 201–202).

The trial court in its charge defined common-law marriage for the jury as follows:

All right, there has been some argument to you on the question of whether or not the defendant was the spouse of the complainant, and there have been allegations to you that there was a common-law relationship between them that constitutes under the law common-law marriage.

Well, let's look at what the law says about what common-law marriage is. Common-law is effected by agreement of the parties without the benefit of formality of a license or of any ceremony, plus cohabitation and reputation that they live as such and present themselves to the world, not just to a group or a few of us, but to the world as husband and wife, that they transact business in that name and for that purpose.

The basic element of common-law is the present agreement to marry. The law says there must be a present verbalization of it: "I take you," for instance, "as my wife. I take you as my husband."

It must be *verba de praesenti*, says the law, and then there must be cohabitation and by reputation. Reputation alone or cohabitation alone cannot constitute a marriage and is not common-law marriage.

The mere fact that the parties alone, or by a few people are put out as man and wife is insufficient evidence to establish a marriage. There must be proof of present agreement between the two parties at the time they engaged in the marital state, reputation and cohabitation, which involves the entire world, the entire community, not just a few people. That is the definition of a common-law marriage.

(N.T. 3/4/88, 126–127).

A little later, the court made the following statement to the jury concerning the sufficiency of the evidence showing a common-law marriage: "It is the opinion of this court, which you are not bound by, that such evidence does not exist in this case."

Appellant cites the following in charging misconduct by the prosecutor for allegedly bringing in information not in evidence:

Prior aspects of the relationship: Ladies and gentlemen, when I put the complainant on the witness stand and asked her questions, I could have asked her questions about what happened in the past. I could have sought to establish that she had every reason to fear the defendant, that he had hit her in the past, that he had busted her lip in the past, that he gave her a black eye in the past.

You don't think I knew about that beforehand? I didn't, though, and do you know why? Because I didn't think it was fair.

What I thought was fair is for this jury to concentrate on what happened on November 17, 1987, in the early morning hours and in the early morning hours alone.

So, I said, "Alicia, directing your attention to that date, other than the fact that you obviously know the defendant from before, what happened?" So, I didn't ask

those questions, but counsel did. He wants to know. It happens every time.

Let's bring in, drag in the whole prior relationship. Guess what? The only problem with that is that you're stuck with the answers, and the answers are, "Yeah, I broke up with him. I had one too many busted lips and one too many black eyes, and I was too embarrassed to go out and report these. I don't want to go out with my face all discolored and cut."

I didn't ask about that, but he did, and that was his cross-examination, and you heard the answers. The answers, that's the evidence. That's the testimony. That's where you get the truth from.

What was the essence of her cross-examination? What was the important part, where you got right to the heart of the matter, November 17th? She says, "I didn't want him to touch me. I just didn't want to get hurt." That was the bottom line in her testimony on direct and cross-examination. It was, "Joe, don't do it."

(N.T. 3/4/88, 84–85).

Concerning his fourth issue, appellant excerpts the following as showing that the trial court's remarks during its charge to the jury were improper and should have been timely objected by prior counsel:

You will find in this case, when I come to charging you on the crimes themselves, that the person who commits an act, a criminal act, must do so intentionally, and you have a problem with intention because intention is a mental state and it's not viable, you can't see it, can't feel it, can't touch it.

The only way it can be proven, if proven at all, is through circumstantial evidence: By the words spoken by the actor, or the action taken by the actor, or the surrounding circumstances and the reasonable inferences that a reasonable person can make from that.

For instance, if I came at you in anger and stated to you I was going to punch you in the mouth, and I cocked my fist and swung it toward your head, and I missed, you

could divine what my intent is by the actions that I spoke and the tone of voice in which I spoke them and the actions that I took, and you will infer that I intended to do you harm, punch you in the mouth.

There was evidence in this case that, after the alleged incident and the reporting of the incident to the police, that the defendant barricaded himself and held the police at bay and even threatened his own life. There was evidence of that.

Of course, you have to evaluate that evidence to determine its quality and how much of it you would accept.

I can say to you that, generally speaking, when a crime has been committed and the person thinks that he is or may be accused of having committed it, and he barricades himself, flees, conceals himself from the authorities, such actions [sic] is a circumstance, a factor tending to prove the person's consciousness of guilt.

### I.A.

■ Appellant was charged with the crime of rape as defined in 18 Pa.C.S.A. § 3121. "A person commits a felony ... when he engages in sexual intercourse with another person *not his spouse:* ..." 18 Pa.C.S.A. § 3121 (emphasis added). This exclusion does not extend, however, to "spouses living in separate residences." 18 Pa.C.S.A. § 3103. The distinction between domicile and residence is that the former is a matter of intention while the latter is a physical fact. *Boswell v. South Carolina Insurance Company,* 353 Pa.Super. 108, 116, 509 A.2d 358, 362 (1986). Vaughn had been living with appellant until September of 1987, two months before the rape, when she "moved out." Vaughn no longer resided with appellant and had started living with her sister. Vaughn was not merely staying over for a few nights at her sister's place; she had decided to live apart from appellant. Evidence of her living alternately with appellant for several months and with her sister for several months in the years before the incident in order to show she may not have intended to stay with her sister is of

no moment. She was "physically" in a separate residence. Therefore, even if it were shown that she was appellant's spouse by common-law marriage, she would be a spouse living in a separate residence and § 3121 in light of § 3103 would still be applicable. Even if it were determined she was appellant's common-law spouse and was not living in a separate "residence," appellant's assertion that his attempts to show a spousal relationship were improperly blocked are still of no merit as will be shown below.

Opinion evidence by a lay witness is barred when it goes to the "ultimate issue." *Bessemer Stores, Inc. v. Reed Shaw Stenhouse, Inc.*, 344 Pa.Super. 218, 226, 496 A.2d 762, 766 (1985). A question such as whether appellant's family "treated" Vaughn "as if [she] were married to [appellant]" calls for an opinion as to an ultimate issue: whether there was a common-law marriage. How his family treated her is irrelevant to the issue which appellant should have been trying to show: that the couple had a general reputation for being married, which itself is an element in showing common-law marriage (discussed below). Asking Chiquita whether "[appellant] and [her] sister were living in what they call common-law" also goes to the same ultimate issue. Allowing Chiquita to reword the question and ask whether they were living together is improper. The questions are completely different and to equate a common-law marriage with simply living together is unfair. The rephrased question to Chiquita as to whether they were "living together as husband and wife" and the question posed to appellant's landlord as to whether they were living "as man and wife" again call for opinions regarding an ultimate issue. All these questions are subject to varying interpretations and were off the mark from the real issue which was their general reputation for being married and not how others treated them or how they lived.

In the absence of words *in praesenti*, there is a rebuttable presumption of marriage where constant cohabitation plus a general reputation of marriage exist. *In re Estate of Rees*, 331 Pa.Super. 225, 228, 480 A.2d 327, 328 (1984).

Appellant tried to establish that appellant gave financial support to his children. Such questions do not tend to prove a general reputation of marriage. Standing alone, a monetary relationship between appellant and his children does not prove that appellant and Vaughn were married. Therefore, the trial court properly disallowed the disputed questions because they lacked relevancy.

## I.B.

To create a common-law marriage, there must be "an exchange of words in the present tense, *verba de praesenti*, spoken with the specific purpose that the legal relationship of husband and wife be thereby created." *Commonwealth v. Smith*, 511 Pa. 343, 352, 513 A.2d 1371, 1375–1376 (1986), *cert. denied, Smith v. Pennsylvania*, 480 U.S. 951, 107 S.Ct. 1617, 94 L.Ed.2d 801 (1987). Because it is hard to prove such *verba de praesenti*, there is a rebuttable presumption of marriage where two essential elements exist: constant, not irregular or inconstant, cohabitation plus a broad and general, not partial or divided, reputation of marriage. *In re Estate of Rees*, 331 Pa.Super. at 228, 480 A.2d at 328. "Cohabitation and reputation are merely circumstances from which the existence of a contract of marriage can be inferred" and not requisites per se to prove a common-law marriage. *In re Estate of Kovalchick*, 345 Pa.Super. 229, 235, 498 A.2d 374, 377 (1985).

In its charge to the jury quoted above, the trial court made the three factors—*verba de praesenti*, constant cohabitation, and general reputation—all conjunctive elements instead of partially disjunctive. Viewed equationally, the elements should have been expressed as common-law marriage = *verba de praesenti* or = (rebuttable presumption: constant cohabitation + general reputation). Instead, the "formula" expressed was: common-law marriage = *verba de praesenti* + constant cohabitation + general reputation. Such error was harmless, however, because it was neither shown that their cohabitation was indeed constant nor their

reputation general. Testimony showed that appellant and Vaughn had lived together sporadically up until two months before the incident when Vaughn moved out. Further, appellant's questions were designed to elicit each individual's opinion as to what their relationship was and not what their reputation was in the community or among their friends. Where the court implied in its opinion that cohabitation and reputation in addition to a contract of marriage were needed to find a common-law marriage, such misunderstanding was found to be harmless. *In re Estate of Kovalchick*, at 236, 498 A.2d at 377.

### I.C.

A court may "express its own opinion on the evidence ... providing that statements have reasonable basis and it is clearly left to the jury to decide the facts...." *Commonwealth v. Leonhard*, 336 Pa.Super. 90, 95, 485 A.2d 444, 446 (1984). The trial court here, before it voiced its opinion, stated the elements it perceived were needed for a common-law marriage. Even though the basis for its opinion was erroneous, its effect was not harmful as discussed above. When the trial court did give its opinion, it immediately qualified it by stating that the jury was not bound by it. Therefore, the expression of its opinion was permissible.

### II.

There is no hearsay if contents of police radio calls are offered not for their truth but to explain the officer's course of conduct. *Commonwealth v. Sneed*, 514 Pa. 597, 606, 526 A.2d 749, 754 (1987) *citing Commonwealth v. Cruz*, 489 Pa. 559, 565, 414 A.2d 1032, 1035 (1980). The allegedly objectionable radio call concerned a woman screaming in the area of Chiquita's apartment at about the time of appellant's assault outside of the same apartment. The call was made an hour before Chiquita called to report a missing person and several hours before Vaughn made a formal complaint to the police. Because it was in the area

of Officer Jacobs' patrol in North Philadelphia, it was she who was dispatched each time. The contents of the first radio call were offered to show her actions in responding to the next call and both calls were relevant to the way she handled the final call concerning the rape complaint.

## III.

During the closing, prosecutors are allowed to argue "any reasonable inferences arising from the evidence." *Commonwealth v. Lawson,* 519 Pa. 175, 190, 546 A.2d 589, 596 (1988). When appellant asked Vaughn the open-ended question on cross-examination, "Why had you left him?," Vaughn divulged a history of abuse at appellant's hands. She testified that: "[Appellant] tried to make [her] do things that [she] didn't want to do;" "[appellant] would push [her] and hold [her] against [her] will;" and that when she and appellant fought and he had "blackened [her] eyes and busted [her] lips," she was too embarrassed to go to the police to file a complaint. (N.T. 3/3/88, 128–129). In his closing cited above, the prosecutor expressly asserted to the jury that he had no knowledge of these incidents of ill treatment and implied that he did not investigate them because they were not relevant to the event in question. (N.T. 3/4/88, 84). The prosecutor properly inferred a history of abuse because Vaughn did not simply testify to one prior incident but implied a history of incidents.

## IV.

One of the factors that must be proven to demonstrate ineffectiveness of prior counsel is that the underlying claim has arguable merit. *Commonwealth v. Davis,* 518 Pa. 77, 83, 541 A.2d 315, 318 (1988). In this case, appellant's claim is ineffectiveness for failing to object to the trial court's allegedly prejudicial instructions to the jury concerning appellant barricading himself in his apartment after the incident. The underlying claim is that the instructions were so prejudicial as to dictate a new trial.

"Evidence of flight or self-concealment ... may be admitted to show consciousness of guilt and may form a basis,

along with other evidence, for an inference of guilt." *Commonwealth v. Colson*, 507 Pa. 440, 464–465, 490 A.2d 811, 823–824 (1985), *cert. denied, Colson v. Pennsylvania*, 476 U.S. 1140, 106 S.Ct. 2245, 90 L.Ed.2d 692 (1986). The trial court may instruct the jury that an inference of consciousness of guilt could be drawn from evidence showing flight and concealment. *Commonwealth v. Ignatavich*, 333 Pa. Super. 617, 625, 482 A.2d 1044, 1048 (1984). In this case, there was evidence showing that after the incident, appellant had fled to his apartment and held the police at bay by holding a knife to his throat. The trial court was able to couch its instructions (see facts above) in terms of what the jury could find after evaluating evidence of such conduct and not what it should find. The court in effect was emphasizing that it was the jury's province and not the trial court's. Therefore, the trial court's instructions were not prejudicial and so, the ineffectiveness claim fails.

Judgment of sentence affirmed.

McEWEN and MELINSON, JJ., concur in the result.