672 A.2d 293

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Harold C. WILSON, Appellant.**

Supreme Court of Pennsylvania.

Argued Oct. 23, 1995.

Decided Feb. 27, 1996.

430

432

434

James S. Bruno, Philadelphia, Harold Wilson, for Appellant.

Catherine Marshall, Alan Sacks, Philadelphia, Robert A. Graci, Attorney General's Office, Harrisburg, for Appellee.

Before NIX, C.J., and FLAHERTY, ZAPPALA CAPPY, CASTILLE and MONTEMURO, JJ.

### OPINION

ZAPPALA, Justice.

On October 4, 1989, a jury convened in the Court of Common Pleas of Philadelphia County convicted Appellant, Harold C. Wilson, of three counts of first degree murder, 18 Pa.C.S. § 2501; and possession of an instrument of a crime, 18 Pa.C.S. § 907. Following the jury's pronouncement of its verdict of guilt, a sentencing hearing was conducted in accordance with 42 Pa.C.S. § 9711. The jury found that there was one aggravating circumstance, a murder committed before or

at the same time as another murder, 42 Pa.C.S. § 9711(d)(11), and no mitigating circumstances, thereby imposing the death penalty for each murder conviction. Appellant was then formally sentenced to death and to a concurrent term of one to two years imprisonment on the possession of an instrument of a crime conviction. Direct appeal from the judgments of sentence of death was taken to this Court pursuant to 42 Pa.C.S. § 9711(h).

A review of the record reveals that on April 10, 1988, at 10:17 a.m., as a result of a radio call, the Philadelphia police went to 1516 South Stillman Street in Philadelphia. Upon their arrival, the police discovered three bodies which were lying in the hallway and in the front and rear bedrooms. The front and rear doors and windows did not show any damage or evidence of forced entry.

The body in the hallway was identified as Dorothy Sewell and was found lying face down with multiple injuries. There was blood splattered around Sewell, and a large butcher knife with blood on its blade was found next to the body. In the rear bedroom, the police found the body of Tyrone Mason. Mason was lying on his back with gaping wounds to the neck and multiple injuries to his legs and arms. The police then found the body of Cynthia Goines–Mills in the second floor front bedroom. Goines–Mills was lying face down with multiple deep chop wounds to the left side of her face. Goines–Mills's left thumb was severed from her body.

At trial, the Commonwealth presented the testimony of Rachel Mason Stevens, who testified that her aunt, Sewell, her cousin, Mason, and her grandfather resided at 1516 South Stillman Street. Stevens testified that on April 9, 1988, at approximately 2:00 p.m., she went to 1516 South Stillman Street and that Appellant, Mason and Sewell were there. Stevens also testified that Sewell remained asleep in the front bedroom and got up occasionally to sell drugs. According to Stevens, Goines–Mills arrived at some point in the afternoon and she, Mason, and Goines–Mills spent the rest of the day and evening smoking cocaine. At some point Stevens observed Sewell with an envelope containing $150.00 in bills.

Stevens testified further that during the course of the evening, she was looking for matches when she observed a hatchet in Mason's bedroom. Stevens remained at 1516 South Stillman Street until 4:00 a.m. on Sunday, April 10, 1988. When Stevens left, Sewell was asleep in the front bedroom, Goines–Mills and Appellant were asleep on couches, and Mason was entering the home after working on his car outside. Stevens returned to 1516 South Stillman at 10:00 a.m., found the bodies and called police.

The Commonwealth also called Vernon Gillespie, who testified that during the early morning hours of Sunday, April 10, 1988, he was present at 1516 South Stillman Street. Gillespie testified that he shared drugs with Stevens, Mason, Goines–Mills and Appellant. At some point, Gillespie stated, they attempted to collect money among themselves to purchase more drugs and Appellant indicated that he did not have any money. Gillespie testified that he went home around 3:00 a.m. on Sunday, April 10, 1988.

Robin Dyson, a friend of Appellant, testified that on April 10, 1988, Appellant arrived at his home at 8:30 a.m. and left at approximately 11:30 p.m. Dyson observed a cut on Appellant's hand. During the day, Appellant gave Dyson $30.00 from a brown envelope that contained money. Dyson then purchased drugs which Dyson, Dyson's wife and Appellant smoked. Appellant's brother joined them that day. Dyson also testified that Appellant had in his possession two bags, which were identified at trial as belonging to one of the victims.

A police investigation of the area surrounding 1516 South Stillman Street disclosed the hatchet which had been seen in Mason's bedroom. The hatchet, which was found in a sewer a half block from the crime scene, had dried blood and matted hair particles on the blade. Subsequently, the police obtained a search warrant for Appellant's mother's home where they found and seized Appellant's bloodstained jacket and slacks from his basement bedroom. The police obtained a second search warrant for the home of Appellant's girlfriend, Tanya

Tindal, where they recovered a tan shoulder bag and brown suitcase.

At trial, Louis Brenner, a forensic instrumentation specialist for the Philadelphia police department, testified that he conducted blood typing tests on various items of evidence. On the handle of the hatchet, Brenner found human blood types A and B. The tip of the butcher knife had human blood type A. Appellant's jacket had human blood type A on the sleeve and type B on the back. Brenner also testified that Goines–Mills had blood type B and Mason had blood type A.

Finally, Dr. Jonathan Briskin, a Philadelphia assistant medical examiner, testified that he conducted post-mortem examinations of Sewell, Goines–Mills and Mason. It was his conclusion that the manner of these deaths was homicide and that the hatchet and knife recovered by police were consistent with the wounds that he found on all three bodies.

Appellant's first argument is that there was insufficient evidence to convict him of first degree murder because the testimony of the witnesses indicated that he spent the evening smoking cocaine. Therefore, due to his intoxicated condition, it was impossible for him to form a specific intent to kill.

When reviewing a sufficiency of the evidence claim, an appellate court, viewing all the evidence and reasonable inferences therefrom in the light most favorable to the Commonwealth as verdict winner, must determine whether the evidence was sufficient to enable the factfinder to find that all of the elements of the offenses were established beyond a reasonable doubt. *Commonwealth v. Burgos*, 530 Pa. 473, 476, 610 A.2d 11, 13 (1992).

In order to prove murder of the first degree, the Commonwealth must show that a human being was unlawfully killed, that the accused committed the killing, and that the killing was done in an intentional, deliberate and premeditated manner. *Commonwealth v. Mitchell*, 528 Pa. 546, 599 A.2d 624 (1991). The element which distinguishes first degree murder from all other degrees of criminal homicide is the presence of a willful, premeditated and deliberate intent to

kill. This essential element of intent may be proven by circumstantial evidence. *Commonwealth v. Williams*, 455 Pa. 539, 316 A.2d 888 (1974).

Evidence of intoxication or drug use does not of itself negate otherwise sufficient evidence of specific intent. *Commonwealth v. Stoyko*, 504 Pa. 455, 475 A.2d 714 (1984), *cert. denied*, 469 U.S. 963, 105 S.Ct. 361, 83 L.Ed.2d 297 (1984). Instead, a defendant claiming use of such intoxicants must be overwhelmed or overpowered by them to the point of losing control over his/her faculties. *Commonwealth v. Edmiston*, 535 Pa. 210, 634 A.2d 1078 (1993).

The record clearly supports Appellant's claim that he was smoking cocaine during the evening prior to this incident. However, there was no evidence introduced that Appellant's drug use before the murders caused him to lose control of his faculties.[1] Based on this record, there was sufficient evidence for the jury to have determined that all of the elements of murder of the first degree were established beyond a reasonable doubt.[2]

Appellant's next argument is that trial counsel was ineffective for failing to call character witnesses on his behalf. Specifically, Appellant claims that his family members, who were present at trial, would have testified as to his good reputation for being a nonviolent person. Additionally, Appellant contends that trial counsel was ineffective for not calling his brother Jonathan Wilson, who would have testified that the injury to Appellant's hand was received while moving furniture.

1. As a corollary matter, Appellant contends that the trial court erred in refusing his request as to a diminished capacity charge. Because there was no evidence that Appellant's drug use before the murders caused him to lose control of his faculties, we find that the trial court did not err in refusing such a charge. See *Commonwealth v. Tilley*, 528 Pa. 125, 595 A.2d 575 (1991).

2. We also reject Appellant's claim that the jury's verdict was so contrary to the evidence as to shock one's sense of justice. *Commonwealth v. Chambers*, 528 Pa. 558, 599 A.2d 630 (1991), *cert. denied*, 504 U.S. 946, 112 S.Ct. 2290, 119 L.Ed.2d 214 (1992).

440

The Commonwealth responds that other than Jonathan Wilson, Appellant fails to identify the supposed witnesses or even allege that he informed counsel of their existence and what they would have said.

The standard for reviewing an ineffectiveness claim is well settled:

> The threshold inquiry in ineffectiveness of counsel claims is whether the issue/argument/tactic which counsel has foregone and which forms the basis for the assertion of ineffectiveness is of arguable merit; for counsel cannot be ineffective for failing to assert a meritless claim. Once this threshold is met we apply the 'reasonable basis' test to determine whether counsel's chosen course was designed to effectuate his client's interests. If we conclude that the particular course chosen by counsel had some reasonable basis, our inquiry ceases and counsel's assistance is deemed effective. If we determine that there was no reasonable basis for counsel's chosen course then the accused must demonstrate that counsel's ineffectiveness worked to his prejudice. The burden of establishing counsel's ineffectiveness is on the appellant because counsel's stewardship of the trial is presumptively effective. [citations omitted].

*Commonwealth v. Weiss*, 530 Pa. 1, 5–6, 606 A.2d 439, 441–442 (1992). In assessing a claim of ineffectiveness, where it is clear that Appellant has failed to meet the prejudice prong, the claim may be disposed of on that basis alone, without a determination of whether the first two prongs have been met. *Commonwealth v. Travaglia*, 541 Pa. 108, 661 A.2d 352 (1995).

To establish that counsel was ineffective for not calling certain witnesses, a defendant must prove the existence and availability of the witnesses, counsel's actual awareness of, or duty to know of the witnesses, the witnesses' willingness and ability to cooperate and appear on the defendant's behalf, and the necessity for the proposed testimony. *Commonwealth v. Stanley*, 534 Pa. 297, 300, 632 A.2d 871, 872 (1993).

Appellant does not identify by name the relatives who were in the courtroom nor does he allege that trial counsel

knew of them or their presence. Similarly, Appellant does not allege that trial counsel knew of his brother Jonathan Wilson. Nor is there evidence as to any of these witnesses' willingness and ability to cooperate and appear on Appellant's behalf. Trial counsel therefore cannot be deemed ineffective.

Appellant's third contention is that trial counsel was ineffective for not objecting on *Batson* grounds to the prosecutor's use of peremptory challenges in a discriminatory manner to remove nine blacks and one hispanic from the jury.

In *Commonwealth v. Hardcastle,* 519 Pa. 236, 243, 546 A.2d 1101, 1104 (1988), we stated that under *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), a criminal defendant has the burden of establishing a prima facie case by showing:

1. that he/she is a member of a cognizable racial group; and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race;

2. that the peremptory challenges constitute a jury selection practice that permits those to discriminate who are of a mind to discriminate; and

3. the facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race.

The striking of a number of individuals belonging to some cognizable minority group is not dispositive that a violation of *Batson* has occurred. See *Commonwealth v. Abu–Jamal,* 521 Pa. 188, 197, 555 A.2d 846, 850 (1989).

The fact that the Commonwealth used 10 of its 20 peremptory challenges for African–American veniremen and a hispanic venireman without more is insufficient to establish a prima facie case that the Commonwealth acted improperly so as to deny Appellant a fair trial. Moreover, the Commonwealth argues that there was a neutral reason for each challenge the Appellant cites as improper. Finally, the final racial composition of the jury is unclear from the record.

Because Appellant has failed to articulate the basis on which a claim of prejudice exists, trial counsel cannot be deemed to be ineffective.

Another issue Appellant raises is whether the trial court erred in refusing to grant Appellant's challenge for cause as to Jurors No. 819, 263, 176 and 117. Specifically, Appellant claims that during voir dire, Juror No. 819, Christopher Jones, testified that he felt appellant had done something wrong because he was arrested; Juror No. 263, Michael Lydon, indicated that he would worry about his bills if he served on the jury; Juror No. 176, John Hollender, indicated that he had a fixed opinion that a police officer has good credibility if he is testifying; and Juror No. 117, William Dougherty, indicated that his brother is a Philadelphia police officer in the same district where the crime occurred.

It is well established that:

The test for determining whether a prospective juror should be disqualified is whether he is willing and able to eliminate the influence of any scruples and render a verdict according to the evidence, and this is to be determined on the basis of answers to questions and demeanor.... It must be determined whether any biases or prejudices can be put aside on proper instruction of the court.... A challenge for cause should be granted when the prospective juror has such a close relationship, familial, financial, or situational, with the parties, counsel, victims, or witnesses that the court will presume a likelihood of prejudice or demonstrates a likelihood of prejudice by his or her conduct and answers to questions.... The decision on whether to disqualify is within the discretion of the trial court and will not be reversed in the absence of a palpable abuse of discretion....

*Commonwealth v. Colson,* 507 Pa. 440, 490 A.2d 811, 818 (1985), *cert. denied,* 476 U.S. 1140, 106 S.Ct. 2245, 90 L.Ed.2d 692 (1986).

The record reveals that, contrary to Appellant's claim, John Hollender (Juror No. 176) testified that he would not

assume that a police officer was truthful merely because he was an officer, nor would he automatically resolve a conflict between a civilian witness and a police officer in favor of the officer. N.T. 9/11/89. 71–77. Christopher Jones (Juror No. 819) denied that Appellant must have been guilty because he had been arrested. N.T. 9/12/89, 35–38. As to William Dougherty (Juror No. 117), the record discloses that Dougherty indicated no problem in being fair, although his brother worked as a police officer in the district where the incident occurred. Dougherty stated that he would not tell his brother that he was serving on the jury. He also said that he assumed Appellant was innocent and that he could be a fair juror. N.T. 9/19/84, 51–55. Finally, the record discloses, contrary to Appellant's claim, that Michael Lydon (Juror No. 263) was removed by the trial court for cause. N.T. 9/19/89, 113.

The trial court did not abuse its discretion in refusing to remove these veniremen for cause. The trial court, which observed the prospective jurors' demeanor and heard their responses, was in the best position to assess the credibility of their statements that they could be fair.

Appellant's fifth claim of error is that trial counsel was ineffective in failing to object to the Commonwealth's challenge for cause of one of the jurors who testified that she would not feel comfortable in imposing capital punishment. Specifically, Appellant contends that Clara Hutchinson did not reveal a fixed inability to return a death verdict, as required by *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), *rehearing denied*, 393 U.S. 898, 89 S.Ct. 67, 21 L.Ed.2d 186 (1968).

The Commonwealth argues that in *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the U.S. Supreme Court rejected the contention that *Witherspoon* requires this showing with unmistakable clarity. On this reasoning, the Commonwealth argues, *Wainwright* upheld the exclusion of a prospective juror who thought that his beliefs about the death penalty might interfere with deciding guilt or innocence. For this reason, the Commonwealth claims that

Appellant's trial counsel properly did not object when the trial court correctly removed the juror for cause.

The decision whether to disqualify a juror for the inability to impose a death sentence in a proper case lies in the discretion of the trial court which will not be reversed except for abuse of that discretion. *Commonwealth v. Colson,* 507 Pa. 440, 490 A.2d 811 (1985), *cert. denied,* 476 U.S. 1140, 106 S.Ct. 2245, 90 L.Ed.2d 692 (1986). The standard to be applied in such a case is whether the prospective juror's views would prevent or substantially impair execution of the juror's duties. *Commonwealth v. Lewis,* 523 Pa. 466, 567 A.2d 1376 (1989).

Examination of the record reveals that Clara Hutchinson stated that as a matter of conscience, she would not impose the death penalty even in a proper case because she was not one hundred percent comfortable with it. Although she said that she might impose a capital sentence depending on the circumstances of the particular case, she would not commit herself to follow the court's instructions on capital sentencing or to impose a capital sentence in a case in which the court's instructions mandated that sentence. N.T. 9/14/89, 6–12. Given Ms. Hutchinson's response, the trial court did not abuse its discretion in disqualifying her, and trial counsel's failure to object was not ineffective.

Another issue Appellant raises is whether the trial court erred in preventing Appellant's cross-examination of Vernon Gillespie about Rachel Mason Stevens's reputation for honesty.

The scope and manner of cross-examination lies within the discretion of the trial court, which will not be reversed except for an abuse of discretion. *Commonwealth v. Sisco,* 484 Pa. 85, 398 A.2d 955 (1979). A trial court properly exercises its discretion to exclude cross-examination on matters having no relationship to the case. Reputation evidence represents the consensus of the community; it is not the opinion of one person or a handful of persons. *Commonwealth v. Blount,* 538 Pa. 156, 647 A.2d 199 (1994).

 The record reveals that the trial court sustained objections to two questions that Appellant asked Gillespie: "What kind of person is Rachel Mason?" and "Do you understand why people may not want to pull out money in front of her?". N.T. 9/26/89, 114. Neither of these questions bore on the consensus of the community regarding Stevens's reputation for honesty. Instead, both questions concerned only Gillespie's personal opinion of Stevens, which was irrelevant to any issue at trial. The trial court, therefore, properly exercised its discretion to exclude such cross-examination.

Next, Appellant argues that he is entitled to a new trial because the trial court erroneously permitted Tanya Tindal to testify against him in violation of 42 Pa.C.S. § 5913.

 To create a common law marriage, there must be an exchange of words in the present tense spoken with the specific purpose that the legal relationship of husband and wife be thereby created. *Commonwealth v. McLean*, 387 Pa.Super. 354, 564 A.2d 216 (1989). In absence of formal words, a rebuttable presumption of marriage may arise based upon certain circumstantial evidence, i.e., constant cohabitation and broad and general reputation of marriage. Cohabitation and reputation are merely circumstances from which the existence of a contract of marriage can be inferred, and not sufficient per se to prove a common law marriage. *Id.* If the trial court finds a common law marriage exists, confidential communications between spouses are subject to the spousal privilege.

 Appellant contends that he lived with Ms. Tindal for nine years in Virginia, Maryland and Pennsylvania. This evidence, Appellant argues, establishes a presumption that the parties were married and the Commonwealth failed to produce any evidence to rebut this presumption.

 Contrary to Appellant's contention, the burden of proof rests on the party claiming the existence of a common law marriage. *In re Estate of Stauffer*, 504 Pa. 626, 476 A.2d 354, 356 (1984). Furthermore, although he asserts that he lived with Ms. Tindal for nine years, Appellant fails to allege,

nor does the record show, that he and Ms. Tindal had a general reputation as husband and wife in the community. Therefore, the trial court did not abuse its discretion in finding that a common law marriage did not exist.

Appellant's final issue is whether the trial court erred in denying his Motion to Dismiss pursuant to Pa.R.Crim.P. 1100.[3]

Rule 1100 requires the Commonwealth to prosecute a case within 180 days of the complaint when the defendant is incarcerated. Pa.R.Crim.P. 1100(a)(2). Time is excludable from the 180–day period when the defendant and/or his attorney are unavailable or any continuances are granted at the request of the defendant's attorney. Pa.R.Crim.P. 1100(c)(3). Trial courts are not required to rearrange their dockets to accommodate Rule 1100 run dates. *Commonwealth v. Smith,* 524 Pa. 72, 569 A.2d 337 (1990).

The record reveals that Appellant's complaint was filed on July 1, 1988, and therefore the technical run date was January 3, 1989. However, Appellant's counsel requested continuances on the following dates, and 203 days was properly ruled excludable: September 26, 1988, October 11, 1988, November 10, 1988, November 22, 1988, December 21, 1988, January 25, 1989, February 28, 1989, March 10, 1989, and March 27, 1989. The amended run date then became July 25, 1989. Appellant's case was placed in the ready pool on April 17, 1989. Pre-trial motions were argued on September 6, 1989. The case was then listed for trial consistent with the court's docket on September 11, 1989.

---

3. Appellant raises four additional claims, none of which have any merit. Contrary to Appellant's claims, the record amply demonstrates that Appellant voluntarily decided not to testify at trial, and that his trial counsel sought to establish the mitigating circumstance of no significant history of prior criminal convictions. 42 Pa.C.S. § 9711(e)(1). As to the trial court's denial of a motion for mistrial, the fact that a detective nodded and said good morning to two jurors was properly found to be an isolated incident. Finally, a review of the Commonwealth's summation reveals no prosecutorial misconduct occurred.

The delay in trying this case was due solely to Appellant. The Commonwealth never requested nor caused a continuance. The trial court listed the case for trial at the earliest possible date available when the case was placed in the homicide ready pool. Appellant's Motion to Dismiss pursuant to Rule 1100 was properly denied.

Our review of the record reveals that the sentence imposed was not the product of passion, prejudice or any other arbitrary factor. Further, the aggravating circumstance found by the jury in this case is supported by the evidence in the record and proven beyond a reasonable doubt. Lastly, the information compiled by the Administrative Office of Pennsylvania Courts indicates that the sentence imposed in this case is not disproportionate to the sentence imposed in similar cases.

Judgment of sentence affirmed.[4]

MONTEMURO, J., who was sitting by designation, did not participate in the decision of this case.

---

**4.** The Prothonotary of the Supreme Court is directed to transmit the complete record in this case to the Governor of Pennsylvania, 42 Pa.C.S. § 9711(i).