J-A13027-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| ESTHER LEWIS AND MARK LEWIS | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellants | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MERCY SUBURBAN HOSPITAL AND | : | No. 936 EDA 2016 |
| MERCY HEALTH SYSTEM, MEMBER | : | |
| CATHOLIC HEALTH EAST | : | |

Appeal from the Judgment Entered May 10, 2016
In the Court of Common Pleas of Montgomery County
Civil Division at No(s):  No:  07-00542

BEFORE:   LAZARUS, J., OTT, J. and FITZGERALD, J.*

MEMORANDUM BY OTT, J.:                    **FILED OCTOBER 06, 2017**

Esther Lewis and Mark Lewis (Lewis[1]) appeal from the judgment entered on May 10, 2016, in the Court of Common Pleas of Montgomery County, in favor of Mercy Suburban Hospital and Mercy Health System, Member Catholic Health East (Mercy Suburban).  Following the presentation of evidence, a jury determined Mercy Suburban had not provided negligent care to Esther Lewis.  In this timely appeal, Lewis raises two issues.  First, Lewis claims the trial court erred in not striking a prospective juror for cause where Mercy Suburban was a client of the juror's employer and so derived a financial benefit from Mercy Suburban.  Second, Lewis argues the trial court erred in preventing

_____

* Former Justice specially assigned to the Superior Court.

[1] "Lewis" will refer to Esther Lewis, who received the medical treatment at issue.  "The Lewises" will refer to Esther and Mark Lewis, collectively.

impeachment of a treating nurse with an FDA safety pamphlet. After a thorough review of the submissions by the parties, relevant law, and the certified record, we affirm.

On October 20, 2005, Esther Lewis presented to the emergency room (ER) of Mercy Suburban Hospital complaining of nausea and vomiting. She was treated, relevant to those complaints, with two, undiluted, 12.5 milligram doses of Phenergan, which were administered via an intravenous (IV) port on the back of her left hand. She subsequently developed tissue and nerve damage in her hand and additionally developed reflex sympathetic dystrophy (RSD). She claimed it was a breach of the standard of care to administer the drug undiluted.

As to the first issue, during *voir dire*, jurors were asked if they had any connections to any of the parties or witnesses involved in the case. Juror Number One worked for a durable medical goods company that did business with doctors and therapists who had privileges with Mercy Suburban. Some of those medical providers had office space at the hospital. Plaintiff's counsel argues the financial ties between Juror Number One and the Defendant, Mercy Suburban, were too close to allow the juror to be fair and impartial and that bias should be presumed. The trial court denied Lewis's motion to strike Juror Number One for cause.

Regarding the second issue, later, during the trial, Lewis attempted to impeach one of the treating nurses with a 2006 FDA safety pamphlet regarding the administration of Phenergan. The trial court denied the admission of the pamphlet as irrelevant in that Lewis's treatment predated the publication of the safety pamphlet. Further, the trial court reasoned the risk of juror confusion outweighed the limited impeachment value of the pamphlet.

Lewis argues the trial court erred in failing to strike for cause Juror Number One.

> Generally, "[t]he decision on whether to disqualify is within the discretion of the trial court and will not be reversed in the absence of a palpable abuse of discretion." ***Commonwealth v. Koehler***, 558 Pa. 334, 737 A.2d 225, 228 (1999) (quoting ***Commonwealth v. Wilson***, 543 Pa. 429, 672 A.2d 293, 299 (1996)); **see Colson**, 490 A.2d at 818; ***Commonwealth v. Black***, 474 Pa. 47, 376 A.2d 627 (1977). However, we have required the trial court to grant a challenge for cause in two scenarios: "when the prospective juror has such a close relationship, familial, financial, or situational, with the parties, counsel, victims, or witnesses" or, alternatively, when the juror "demonstrates a likelihood of prejudice by his or her conduct and answers to questions." ***Bridges***, 757 A.2d at 873; ***see Wilson***, 672 A.2d at 299; ***Colson***, 490 A.2d at 818.

***Shinal v. Toms***, 162 A.3d 429, 440 (Pa. 2017).

With this standard in mind, we examine the relevant portions of the *voir dire* of Juror Number One.

> The Court: Hello. Come on in. Take a seat. We called you back here because you indicated you had some dealings with Mercy Suburban Hospital. You're the durable equipment guy?
>
> Juror: Right. I work with a durable medical equipment company.

Court: Okay. Tell us a little more about your dealings in particular with Mercy Suburban.

Juror: Well, we provide compression pumps for like edema, chronic venous insufficiency arterial pumps. And one of the sales representatives I work with, her – one of her territories is the local territory, so some of her doctors and some of the therapists have privileges with Mercy or would be –

Court: So they're not people you deal with personally?

Juror: Well, I deal with them. I don't know them face to face. I deal with them on the phone or contacting them.

Court: Knowing that Mercy Suburban is the defendant here, does that put you in an awkward position?

Juror: I would hope – I think not. I would hope not. I –

Court: Do you think you could listen to the evidence in this case and make a determination whether or not the nursing staff there did the right thing or not?

Juror: Yes. I mean, none of the names that were brought up were people I've dealt with personally or through the phone.

Court: Okay. Follow up?

Defense Counsel: I don't have any questions.

Plaintiffs' Counsel: I just want to understand a little bit better what is your relationship. I know you said you may not know them directly, but people you deal with directly have business with Mercy?

Juror: Correct. Well, business with the doctors who – right.

Plaintiffs' Counsel: Right. So your tenure with your company; correct?

Juror: Yes.

Plaintiffs' Counsel: So people in your company do business with Mercy, and that matters on the success or lack thereof of your company; correct?

Juror: Correct.

Court: Well, let me just ask, they don't do business with Mercy in particular, or do they, or do they do business with doctors who have privilege at Mercy?

Juror: They do business with doctors who, you know, or the therapists, because we're required to provide our equipment to get prescriptions, documentation filled out by the doctors. It's not done through Mercy per se. It's done through people who have their offices there or-

Plaintiffs' Counsel: But your business is, you have direct contact with Mercy through your colleagues?

Juror: Yes.

Plaintiffs' Counsel: And that is sales?

Juror: Yes.

Plaintiffs' Counsel: And you are in sales?

Juror: I am not in sales. I'm more, I call it compliance officer, is really what it is. Really what my job is is to make sure is a patient, if we're provided with a patient, we have to then make sure that their insurance provides that their – which equipment they would provide. And that also is dealing with the doctor or dealing with the staff, what is the best to treat the patient that we comply through their insurance.

Plaintiffs' Counsel: The company overall is sales?

Juror: Yes. Oh, I thought you were asking me specifically. Until about three years ago, I know, it's a very odd change. There is a gap there. But I did – I was a sports writer for the Times Herald here in the paper for about 20 years and then left a couple of years ago.

N.T. Trial, 12/7/2015, at 60-64.

- 5 -

Based upon the above *voir dire*, Lewis asserts that the fact that the Juror's employer sells durable medical goods to Mercy Suburban, a close business relationship existed between Mercy Suburban and the Juror should be presumed biased. ***See McHugh v. Proctor Gamble Paper Products Co.***, 776 A.2d 266 (Pa. Super. 2006) (where a close financial relationship between juror and party exists, bias should be presumed.).

The trial court disagreed with Lewis that the relationship between Juror Number One and Mercy Suburban represented a close financial tie. The trial court reasoned:

> [T]he trial court properly found that Juror Number One did not have such a  close relationship, be it familial, financial or situational with the parties, counsel, victims, or witnesses such that prejudice should be presumed, and that, the law as it stood did not require a finding of per se or presumed prejudice in indirect relationship situations. Nor did Juror Number One demonstrate the likelihood of prejudice as evidence by his answers to individual *voir dire*.
>
> To further explain, based upon the follow-up *voir dire*, the trial court found that Juror Number One's relationship with [Mercy Suburban] was not direct, it was removed. This finding was based upon the *voir dire*, *supra*, wherein Juror Number One asserted that he worked as a compliance officer for a durable medical equipment company whose client is Defendant Mercy Suburban. Juror Number One stated that he did not do sales, rather, his job involved determining what equipment was covered by the patient's insurance. The juror likewise explained that his employer does not sell equipment directly to Mercy Suburban, rather it sells to doctors with privileges at the hospital. Lastly, Juror Number One added that none of the names discussed in *voir dire* were people that he had dealt with personally or through the phone. Based on the aforementioned replies, the trial court determined that, at most, Juror Number One had an

indirect/remote relationship with the Defendant Mercy Suburban Hospital.

Trial Court Opinion at 8.

The certified record supports the trial court's reasoning.

Our Supreme Court has recently clarified the standards for this issue. In **Shinal v. Toms**, *supra*, a medical negligence action, the Pennsylvania Supreme Court held that an indirect employment relationship, standing alone, does not present a presumption of prejudice that would require the disqualification of the potential juror. In **Shinal**, four jurors at issue were employed by subsidiary companies owned by the same parent company that employed the defendant doctor, although the subsidiary companies were not parties to the action. Our Supreme Court stated:

> An indirect employment relationship will require removing a potential juror for cause of the juror believes that the outcome of the case could have a financial impact upon his or her employer. When it is apparent that there is a common employer between a juror or a juror's close family member and a party defendant, and that juror believes that the employer would be affected by the outcome of the case, the trial court must remove he juror for cause.

**Shinal v. Toms**, 162 A.3d at 447 (footnote omitted).

Here, Juror Number One was not employed by Mercy Suburban or any subsidiary of Mercy Suburban. Juror Number One was employed by a company that did business with doctors and therapists who had privileges at Mercy Suburban. There was no evidence that any of these doctors were employed by Mercy Suburban. Accordingly, Juror Number One did not work for a company that had a direct financial connection to Mercy Suburban.

Rather Juror Number One's employer did business with medical professionals who had privileges at Mercy Suburban. If the indirect employment relationship in **Shinal** did not require the disqualification of four jurors, we see no abuse of discretion in the trial court's refusal to strike Juror Number One for cause. Accordingly, the Lewises are not entitled to relief on this issue.

Next, Lewis claims the trial court erred in preventing the use of an FDA pamphlet regarding Phenergan[2] to be used to impeach the testimony of treating Nurse Heather Logan. We note that our standard of review for evidentiary rulings is a narrow one:

> When we review a trial court's ruling on admission of evidence, we must acknowledge that decisions on admissibility are within the sound discretion of the trial court and will not be overturned absent an abuse of discretion or misapplication of law. In addition, for a ruling on evidence to constitute reversible error, it must have been harmful or prejudicial to the complaining party.

**Hatwood v. Hospital of the University of Pennsylvania**, 55 A.3d 1229, 1239 (Pa. Super. 2012) (citation omitted).

Additionally,

> [a]n abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by the evidence or the record, discretion is abused.

_____

[2] Neither of the briefs from the parties nor the trial court opinion explains what Phenergan does. However, Defense Trial Exhibit D114, Prentice Hall Nurse's Drug Guide 2005, indicates, among other uses, the drug is used to quell nausea.

***Stapas v. Giant Eagle, Inc.***, 153 A.3d 353, 367 (Pa. Super. 2016) (citation omitted).

Specific facts relevant to this issue developed during trial were that, when Mrs. Lewis presented to the ER at Mercy Suburban, complaining of nausea, abdominal pain and vomiting, she was provided with an IV drip of saline. The saline was administered via an IV port placed in the back of her left hand. The port also allowed for the introduction of other medicines; in this case, Phenergan. Twice during her stay at the Mercy Suburban ER, 12.5 mg doses of Phenergan were administered through the IV port. Each dose took approximately one to two and one-half minutes to complete. Although Phenergan, an acidic fluid,[3] mixed with the saline at the IV port prior to the fluids actually entering Lewis's blood, Lewis contended additional dilution of Phenergan was required to meet the standard of care and greatly lower, if not prevent, the Phenergan from causing nerve and tissue damage. The defense contended that in the 12.5 mg doses used, no further dilution was necessary or required.

On cross-examination, Nurse Heather Logan, one of the two nurses who administered Phenergan to Mrs. Lewis, testified as follows:

Q: And if it's diluted more, it's better, that would cut down on the problems it would cause, such as thrombophlebitis or nerve problems?

_____

[3] Pursuant to testimony from Lewis's expert, Phenergan is approximately 4.5 on the pH scale. A pH of 7 is neutral.

A: Again, I'm going to take you back to what I was trained to do. It was recommended in the PDR, the drug guidebook, that says anything under 25 milligrams does not need to be diluted.

Q: And that's per the label and the FDA, right?

A: That is per the drug guide 2005.

Q: And I think you told us earlier that the FDA guidelines are the same way through the label. They're all the same?

A: I'd have to look at that.

Q: And have you reviewed anything from the FDA which says you should dilute?

A: Not while I've been working in the OB unit, no.

Q: And, like I said, the standards are all the same, 2002, 2005, 2000, always the same with respect to in the ER giving IV Phenergan, right?

A: With respect to the ER, yes. Let me remind you that I have not been in the ER in eight years.

Q: Okay. We're not going to go there. I don't want to talk about after.

A: Okay. But I think it's relevant for what you're asking me.

Q: What do you mean?

A: Because I haven't practiced in the ER in years.

Q: But I'm talking about up through 2005, so it would be maybe 2008 or before, right?

A: Okay.

N.T. Trial, 12/9/2015, at 200-01.[4]

After this exchange, counsel for Lewis attempted to introduce a pamphlet from the FDA, dated December 2006, that purportedly stated Phenergan should always be diluted prior to use. No copy of this pamphlet appears in the electronic record transmitted to this court.[5] Counsel for Mercy Suburban objected to the pamphlet as being irrelevant, having been published more than one year post Lewis's treatment at Mercy Suburban. Counsel for the Lewises argued the following:

> Counsel: [Nurse Houston has said] how it occurred. Not every standard of care is in writing, but what this shows is that it's something that was an ongoing problem and that – it connects that it was a standard of care before.
>
> They're saying you never dilute it. You never dilute it. That's not true. You do dilute this. It is to impeach her credibility, her credibility says you always, before, during and after this, even through today, and that's what Nurse Brown said as well, is you don't need to dilute it.

_____

[4] Just prior to this exchange, Nurse Logan agreed that the low dose, undiluted ER use of Phenergan would still be acceptable. **Id**. at 199.

[5] Plaintiff's exhibits transmitted to this Court include photographs, bills and an estimation of future medical expenses. The pamphlet appears to have been photocopied and appended to Appellant's Brief. Accordingly, we have read the pamphlet, but have not considered it in making our decision. We are allowed to consider only what is contained in the official record. **See MacPherson v. Magee Memorial Hosp. for Convalescence**, 128 A.3d 1209, 1224 (Pa. Super. 2015) (For purposes of appellate review, what is not in the certified record does not exist.). We note that the FDA pamphlet, Patient Safety News #72, February 2008, reprints an article from December 2006, which, in turn references an Institute for Safe Medical Practices Safety Alert dated August 10, 2006 (also post October 2005 treatment at issue here). The relevant gist of these articles is a recommendation that Phenergan administered via IV be diluted.

The Court: Give me a few minutes. I want to look some things up.

*Id*. at 210.

When the trial judge returned, she provided her reasoning for denying

Lewis the use of the pamphlet:

The Court: Okay. I understand that there are broad guidelines for impeachment, that you can impeach pretty broadly.

However, the impeachment is still guided by – the Rule 403 balancing test is still put into place. You still need to look at whether the probative value for impeachment outweighs any prejudicial impact.

And when I look at this, I look at the probative value of what you want to get in. Number one, the probative value for the case in particular is zero. There is no probative value for the standard of care of what went on at the time of this incident.

Then I look at the probative value for impeachment purposes, which is, you want to impeach her statement that she's always done it this way or that this is the standard of care and what we've always done.

I find that this is confusing for the jury. I find that it's really minimal. I don't know what this does to impeach this witness to begin with.

Even if in December of '06 the FDA, some book out there says that you should dilute, you already have an expert that says this, so you don't need to add this on.

It doesn't do anything to really help impeach her, which the standard there is whether or not it helps the jury to decide whether to believe all, part of, or none of her testimony.

Impeaching her on that issue does not go directly to what the core of her testimony is. I don't see that it's probative of it at all, to help impeach her for that purpose.

- 12 -

I find instead that it's going to confuse the jury. It's going to mislead them. And, honestly, it looks like you're trying to back door the standard of care, which doesn't even exist at the time, is what it looks like to me.

So for all of those reasons, I'm not going to allow you to use it for impeachment purposes.

*Id*. at 211-12.[6]

This reasoning does not represent an abuse of discretion. The trial judge determined the pamphlet, which post-dated treatment, could not be used to prove the applicable standard of care.[7] Further, the limited impeachment value of the pamphlet, challenging Nurse Logan's understanding of Phenergan use **after** 2005, was outweighed by the likelihood that the pamphlet would confuse the jury. Neither the ruling nor the reasoning is "manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by the evidence or the record." **Stapas**, **supra**. The Lewises are not entitled to relief on this issue.

In light of the foregoing, the Lewises' arguments are unavailing and no relief is warranted.

Judgment affirmed.

_____

[6] The trial court's Pa.R.A.P. 1925(a) opinion reiterates the reasoning provided by the trial judge at trial. **See** Trial Court Opinion, 11/17/2016, at 9-11.

[7] **See Rittenhouse v. Hanks**, 777 A.2d 1113, 1118 (Pa. Super. 2001) (standard of care must relate to time of treatment).

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date:10/6/2017