737 A.2d 225

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**John Joseph KOEHLER, Jr., Appellant.**

Supreme Court of Pennsylvania.

Argued Nov. 16, 1998.

Decided Sept. 2, 1999.

Reargument Denied Oct. 27, 1999.

mined herein, Appellant is not entitled to relief as his petition is untimely.

338

342

Leonard J. Frawley, Honesdale, for appellants.

Robert B. McGuinness, Towanda, Robert A. Graci, Harrisburg, for Commonwealth.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

## OPINION

NEWMAN, Justice.

John Joseph Koehler (Appellant) has filed a direct appeal[1] from the judgment of sentence of the Court of Common Pleas of Bradford County that sentenced him to death following two convictions for first-degree murder.[2] After a thorough review of the record sent to this Court,[3] and the claims raised by Appellant, we affirm the sentences of death.

## I. FACTS AND PROCEDURAL HISTORY

Regina Clark (Regina) and her nine-year-old son, Austin Hopper (Austin), were killed on April 18, 1995, by William Curley (Curley), at the urging and insistence of Appellant as part of his training of the young Curley for a future career as a "hit man." The bizarre facts regarding the deaths of Regina and Austin, as testified to by Curley at Appellant's trial, are as follows. Curley had known the Appellant since he was very young. By August of 1994, Appellant had told Curley that he

---

1. This Court has jurisdiction of a direct appeal from a judgment of sentence in a case in which the death penalty has been imposed. 42 Pa.C.S. § 9711(h).

2. 18 Pa.C.S. § 2502(a).

3. We note that the notes of testimony alone constitute more than 3500 pages.

was a hit man for the mob. Appellant repeated his claim of being a hit man many times to Curley. Appellant also spoke to Curley about his entering the "profession", promising that Curley could make "six digits" in the field. Curley, who turned eighteen on August 9, 1994, did not dismiss the idea out of hand because he "... thought it would be all right, cause I thought it was going to be more along the lines of people like drug dealers and mob men, people that would hurt innocent people." N.T. Vol. VII, p. 20. Accordingly, Appellant told Curley that he would train him for the business. Charline Benefield, with whom Appellant lived while in Arkansas in late 1994, also testified that Appellant had told her that he was training Curley to be a hit man. N.T. Vol. IV, p. 104.

On April 17, 1995, Curley was staying at the home of his friends Melissa Mack (Mack) and Ricky Hunsinger (Hunsinger). Curley received a message to call Appellant, which he did, and at that time Appellant told him he was bringing "two packages" to Curley and asked if he could "deliver them". Curley agreed. Appellant arrived at the house at 4:00 a.m. on April 18, 1995, accompanied by Regina and Austin.[4] Appellant apparently met Regina while he was living in Arkansas. According to the testimony of Kerrien Ramsey (Ramsey), Ramsey also met Appellant in Arkansas, and, through him met and became friends with Regina, with whom Appellant was romantically involved. Ramsey accompanied Regina, Austin, and Appellant on the trip from Arkansas to New Jersey in late February or early March of 1995. Ramsey testified at trial that on April 16 or 17, 1995, while they were in the bedroom of his mother's apartment,[5] Appellant showed Ramsey a loaded gun and told her that he would kill Regina before she left New Jersey to go back to Arkansas.[6]

4. Regina and Austin evidently were the "packages" to which Appellant referred, although Curley did not know that at the time of the telephone conversation.

5. Appellant and Regina had been staying at his mother's apartment since their arrival from Arkansas some weeks previously.

6. Ramsey testified that the trip from Arkansas to New Jersey was supposed to have lasted for only a few days and that she and Regina were anxious to return home to Arkansas.

Curley also testified that in the early morning hours of April 18, 1995, while Mack, Regina and Austin remained at the house, Curley and Appellant drove to Lounsberry, New York, where Appellant was to pick up money wired to him through Western Union. It was on the drive to New York that Appellant explained that he wanted Curley to kill Regina. At trial Curley testified that he told Appellant he did not want to do it, but Appellant insisted that he "had to", or Appellant would kill Curley. On the drive back to Pennsylvania, Appellant handed Curley a loaded .22 caliber Baretta to use for the murder. Also, on the return drive the pair spent approximately an hour driving around looking for a place to put Regina's body. They found an abandoned refrigerator in a dump, which Appellant examined, and then told Curley to place Regina's body inside the refrigerator. At this point Curley again told Appellant that he did not want to kill Regina, to which Appellant replied, "kill or be killed." N.T. Vol. VII, p. 47.

The pair returned to the Mack/Hunsinger house, picked up Regina and Austin, and then proceeded to Settlers Restaurant. Appellant entered the restaurant while Curley, Regina and Austin drove off, Regina having been told they were to pick up a car Appellant needed for the drive back to her home in Arkansas. In fact, Curley was to go to Stone Jug Road to kill Regina and Austin. The trio arrived at Stone Jug Road and stopped after Curley told Regina he had car problems. They got out of the car, and as Regina was looking for an oil leak, Curley pulled the gun and aimed it at her. (Regina was unaware of this.) Curley testified that he "couldn't do it," so he put the gun away and returned to Settlers Restaurant. At the restaurant, while Regina and her son sat in the car, Appellant again told Curley that he had to find some place to kill Regina. They then decided that the murder should take place at the house of Janet Schrader (Ms. Schrader). Curley knew and was friendly with Kirk Schrader (Kirk), the son of Ms. Schrader. The four drove to the Schrader home and Curley pulled the car into the garage, the location that Appellant had told Curley would be a good place to kill Regina and

Austin. While Austin, Regina and Appellant entered the house, Curley remained alone in the garage. A short time later Appellant returned with Kirk and, in front of him, suggested possible ways to kill Regina. However, before any murder took place, Appellant and Curley left the Schrader residence for Wysox, Pennsylvania, and the parking lot of Citizens Bank. During the drive to Wysox, Curley again told Appellant that he did not think he could kill Regina. Appellant's response was that he had to kill her.

After Curley and Appellant returned to the Schraders', Curley entered the garage and Appellant went into the house. When Regina entered the garage, Curley shot her three times in the head. He then picked her up and placed her in the trunk of the car. Appellant came to the garage, checked Regina's pulse, and said that she was still alive and told Curley that he should slit her throat. Curley got a knife and then he and Kirk entered the car and drove off. Curley testified that he heard a thumping noise coming from the trunk of the car shortly after he left the Schrader garage.

After dropping Kirk off at his friend Roger Hitchcock's (Hitchcock) house,[7] Curley went on to the dump he had discovered earlier in the day. At the dump Curley took Regina's body from the trunk, slightly cut her throat with the knife, placed her body in the refrigerator, closed the refrigerator's door, left the dump and returned to the Schraders'.

When he returned, Appellant told Curley that he had to shoot Austin, too, since Austin was a "loose link." At about 2:30 that afternoon Curley told Austin to come out to the garage and, when he did, Curley shot him three times in his head and at least twice in his body. Curley picked up his body and placed it in the trunk of the car. Appellant then came out to the garage and looked into the trunk at Austin's body. Curley then drove the car to "Snake Road" where he placed Austin's body in a sluice pipe.

7. Hitchcock testified at trial that he spent six and one-half hours with Kirk that day and that Kirk did not mention what had just occurred in his garage. Hitchcock also testified that Kirk's behavior that day was normal.

Curley returned to the Schrader residence, where Appellant cleaned up the blood in the trunk of the car. The two departed the Schrader home together and, after buying a chain, a lock and some spray paint, returned to the Mack/Hunsinger residence. At dusk the two returned to the dump, to chain and lock the refrigerator containing the body of Regina. The chain, however, was too short to circle the refrigerator. The two then drove to "Twin Ponds", near the Schrader house, and, at Appellant's suggestion, Curley threw the knife and gun used in the murders into the pond. Appellant then drove Curley back to the Mack/Hunsinger residence, left him and drove away alone. The next Sunday, April 23, 1995, Curley moved to North Carolina.

The bodies of Regina and Austin were not immediately discovered. It was not until April 26, 1995, when Richard Morris, searching for recyclables, came upon the refrigerator containing Regina's body and opened it. The state police were then called. Mack heard that a body had been found in a refrigerator approximately half a mile from her home, and, when she heard the news broadcast a description of the clothing on the body, Mack recognized it as the clothing worn by Regina when she was at her residence in the early morning hours of April 18, 1995. Mack called the police and later in the day identified the body of Regina at the Robert Packer Hospital, and she also informed the police that Regina had been traveling with a child. Mack gave police permission to search her home, where the police recovered a can of spray paint, a lock and bullets.

The police went to North Carolina on April 28, 1995 to interview Curley. Immediately after they arrived, Curley confessed to the shootings. Curley was taken to the Goldsboro Police Department and, while en route, gave police the location where Austin's body could be found. While in North Carolina, Curley also provided information concerning where the murder weapon could be found and provided details of the crimes. Curley also implicated Appellant in the murders. The police found Austin's body at approximately 11:00 p.m. on

April 28, 1995. On April 29, 1995, the police recovered the discarded gun and knife from Twin Ponds.

Appellant was arrested for the murders of Regina and Austin. Trial testimony began on March 25, 1996. In addition to the evidence outlined above, Isidore Mihalakis, M.D., a forensic pathologist, testified with reference to the injuries of Regina and Austin. Dr. Mihalakis testified that the cause of Regina's death was a gunshot wound to the head and the manner of her death was homicide. Dr. Mihalakis testified that the cause of Austin's death was multiple gunshot wounds and the manner of his death was homicide.

After three weeks of trial, on April 11, 1996, the jury convicted Appellant of two counts of murder in the first degree,[8] two counts of conspiracy to commit murder,[9] two counts of kidnapping [10] and one count of burglary.[11] At the conclusion of the penalty phase of the trial, held on April 12, 1996, the jury returned two death sentences. With regard to the murder of Regina, the jury found the aggravating circumstance that Appellant had been convicted of another murder occurring either before or at the time of Regina's murder,[12] and no mitigating circumstances. The jury likewise found no mitigating circumstances and the same aggravating circumstance in Austin's murder, as well as the aggravating circumstance that, at the time of his death, Austin was less than twelve years old.[13] The trial court imposed the death sentences along with two five to ten year prison terms for the conspiracy counts, two ten to twenty year prison terms for the kidnapping counts and a five to ten year term on the burglary conviction. This direct appeal followed.

## II. *ISSUES*

1. Was the verdict against the weight of the evidence?

**8.** 18 Pa.C.S. § 2502(a).

**9.** 18 Pa.C.S. § 903.

**10.** 18 Pa.C.S. § 2901.

**11.** 18 Pa.C.S. § 3502(a).

**12.** 42 Pa.C.S. § 9711(d)(11).

**13.** 42 Pa.C.S. § 9711(d)(16).

2. Should Appellant's New Jersey statement have been suppressed?

3. Should Appellant's Towanda statement have been suppressed?

4. Should the Commonwealth's DNA evidence have been suppressed?

5. Did the trial court err when it denied Appellant's continuance request?

6. Did the trial court err in the seating of the jury panel?

7. Did the trial court err in denying Appellant's request that Commonwealth witness Kerrien Ramsey undergo psychiatric evaluation?

8. Did the trial court err in limiting introduction of evidence of Ramsey's drug use?

9. Did the prosecutor commit prosecutorial misconduct?

10. Did the trial court err in its instructions to the jury?

11. Did the trial court err in its evidentiary rulings?

12. Does Appellant's sentence violate the equal protection and due process clauses of the United States and Pennsylvania constitutions?

13. Did the trial court err in limiting evidence that Appellant was "nice to children?"

14. Did the trial court err in instructing the jury to disregard a portion of Appellant's counsel's closing argument during the penalty phase?

15. Is the sentence imposed excessive?

## III. DISCUSSION

### A. *Sufficiency and Weight of Evidence*

This Court is required to review the sufficiency of the evidence to sustain a conviction for first-degree murder in every case in which the death penalty has been imposed. *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983), *reh'g. denied*, 463 U.S. 1236, 104 S.Ct. 31, 77 L.Ed.2d 1452 (1983). When reviewing the sufficiency of the

evidence, an appellate court must determine whether the evidence, and all reasonable inferences deducible from that, viewed in the light most favorable to the Commonwealth as verdict winner, are sufficient to establish all of the elements of the offense beyond a reasonable doubt. *Commonwealth v. Hall,* 549 Pa. 269, 280, 701 A.2d 190, 195 (1997). To sustain a conviction for first degree murder,[14] the Commonwealth must prove that the defendant acted with a specific intent to kill, that a human being was unlawfully killed, that the accused did the killing,[15] and that the killing was done with deliberation. *Id.* at 281–82, 701 A.2d at 196. It is the specific intent to kill which distinguishes murder in the first degree from lesser grades of murder. *Commonwealth v. Smith,* 548 Pa. 65, 70, 694 A.2d 1086, 1088 (1997), *cert. denied,* —— U.S. ——, 119 S.Ct. 118, 142 L.Ed.2d 95 (1998). We have held that the use of a deadly weapon on a vital part of a human body is sufficient to establish the specific intent to kill. *Commonwealth v. Walker,* 540 Pa. 80, 90, 656 A.2d 90, 95, *cert. denied,* 516 U.S. 854, 116 S.Ct. 156, 133 L.Ed.2d 100 (1995). Finally, the Commonwealth can prove the specific intent to kill through circumstantial evidence. *Commonwealth v. Brown,* 551 Pa. 465, 711 A.2d 444, 449 (Pa.1998).

**14.** Section 2502 of the Crimes Code, 18 Pa.C.S. § 2502, provides, in pertinent part:

§ 2502 Murder.
(a) Murder of the first degree.—A criminal homicide constitutes murder of the first degree when it is committed by an intentional killing.
. . .
(d) Definitions.—As used in this section the following words and phrases shall have the meanings given to them in this subsection;
. . .
"Intentional killing." Killing by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing.

**15.** A person can be held legally responsible for the conduct of another. 18 Pa.C.S. § 306 provides that one is legally accountable for the conduct of an accomplice and defines accomplice as one who "(1) with the intent of promoting or facilitating the commission of the offense, he (i) solicits such other person to commit it; or. (ii) aids or agrees or attempts to aid such other person in planning or committing it; or (2) his conduct is expressly declared by law to establish his complicity." 18 Pa.C.S. § 306(c).

■ The above-recited evidence presented at Appellant's trial, viewed in the light most favorable to the Commonwealth, clearly establishes that the Commonwealth presented sufficient evidence to support both of Appellant's convictions for first-degree murder.[16] The testimony of Curley, Ramsey, Kirk, and Mack, coupled with the forensic evidence and testimony was sufficient for the jury to conclude that Regina and Austin were unlawfully killed, that Appellant was legally accountable for the conduct of Curley who committed the killings, and that Appellant had the specific intent to kill and the killings were done with deliberation.

■ Appellant also claims that the verdicts are against the weight of the evidence. This Court has repeatedly stated that the "decision to grant or deny a motion for a new trial on the ground that the verdict is against the weight of the evidence is committed to the sound discretion of the trial court. Absent an abuse of discretion its denial of such a motion will not be disturbed." *Commonwealth v. Rucci*, 543 Pa. 261, 670 A.2d 1129, 1137 (1996) *cert. denied*, 520 U.S. 1121, 117 S.Ct. 1257, 137 L.Ed.2d 337 (1997). Further, a new trial should be granted only "when the jury's verdict is so contrary to the evidence that it shocks one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail." *Commonwealth v. Brown*, 711 A.2d at 451. Applying this standard to the case at hand, we conclude that the verdicts entered were not against the weight of the evidence and that Appellant is entitled to absolutely no relief on this claim.

## B. *Pre–Trial Issues*

### 1. *Suppression of New Jersey and Pennsylvania Statements*

Appellant claims that the trial court erred in not suppressing the statement he gave on April 30, 1995, while confined in the Camden County Correctional Facility and the statement

---

**16.** We also find that the evidence was sufficient to support Appellant's convictions for kidnapping, conspiracy to commit murder and burglary.

he gave in Towanda, Pennsylvania on May 1, 1995, after being returned to the Commonwealth.

Appellant claims that his New Jersey statement, given after he was advised of his Miranda[17] rights, and after he signed a waiver of those rights, should nonetheless have been suppressed because his waiver was not based on a "clear understanding" of his rights. Specifically, Appellant claims that he was not told and did not know if, while in New Jersey on Pennsylvania charges, he had a right to a free attorney. He claims that the lack of a clear understanding on his part required the suppression of his New Jersey statement and, now, the grant of a new trial. We emphatically disagree.

When this Court reviews a denial of a suppression motion, our standard of review is whether the factual findings of the suppression court, and the legal conclusions drawn from them are supported by the evidence. *Commonwealth v. Miller*, 541 Pa. 531, 555, 664 A.2d 1310, 1322 (1995), *cert. denied*, 516 U.S. 1122, 116 S.Ct. 932, 133 L.Ed.2d 859 (1996). In determining the voluntariness of a confession and the waiver of Miranda rights, a court considers the totality of the circumstances attending the confession and waiver. *Commonwealth v. Williams*, 537 Pa. 1, 640 A.2d 1251 (1994).[18] Here, our independent review of the record supports the finding of the trial court that there was a knowing and voluntary waiver, and accordingly, we deny him relief on this claim. As stated by the suppression court in its opinion denying Appellant's motion:

> There is not so much as a scintilla of evidence that [Appellant] was intimidated, coerced or deceived. [Appellant] was informed of his Miranda rights. He suffered from no infirmity which would impede his comprehension and in the waiver form which he signed he explicitly acknowledged that he understood his rights and the consequences of

17. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

18. This Court has stated that "[a]ll that is necessary for a valid waiver is that appellant's rights be reasonably conveyed to him." *Commonwealth v. Miller*, 541 Pa. at 555, 664 A.2d at 1322.

abandoning them and that he was abandoning his rights voluntarily.... The Commonwealth therefore affirmatively and convincingly established that any statements by [Appellant] were uncoerced and made with the requisite level of comprehension.

Trial Court Opinion, 3/12/97, at 4.

Appellant also challenges the denial of suppression of his Towanda, Pennsylvania statement, made in response to a comment by Bradford County's former district attorney, Robert Fleury (D.A.).

On May 1, 1995, Appellant was formally interrogated at the Pennsylvania State Police Barracks in Towanda by Troopers Chester Goldyn and David Pelachick. The questioning took place in a small interrogation room at the barracks. Appellant admits that prior to questioning he was once again given his Miranda rights and signed a Miranda waiver form. Upon completion of the questioning, as Appellant and the troopers left the interrogation room and entered a larger squad room, the D.A. (whom the Appellant did not know) asked "is this the babykiller?" Appellant responded "Yes", and later sought to have this response suppressed, claiming that the previous Miranda colloquy was ineffective because it had become "stale".[19] Again, we disagree.

■■■■ This Court has held that not every renewal of an interrogation requires the repetition of Miranda warnings, and that a court must look at the circumstances of each case to determine whether previously provided Miranda warnings have become stale. *Commonwealth v. Proctor*, 526 Pa. 246, 256, 585 A.2d 454, 459 (1991). The criteria used in making this determination are:

**19.** Appellant also claims that the District Attorney questioned him after he had requested to speak to an attorney and questioning by the two troopers had ceased. We note, however, that testimony was presented at the suppression hearing of 3/20/96 that Appellant asked to talk not to an "attorney" but to the District Attorney. *See* N.T. 3/20/96 p. 7. *See also* N.T. 11/22/95 p. 74, in which Trooper Chester Goldyn also testified that Appellant asked to speak to the "District Attorney."

the length of time between the warnings and the challenged interrogation, whether the interrogation was conducted at the same place where the warnings were given, whether the officer who gave the warnings also conducted the questioning, and whether statements obtained are materially different from other statements that may have been made at the time of the warnings.

*Commonwealth v. Bennett,* 445 Pa. 8, 15, 282 A.2d 276, 280 (1971).

■■■ In the instant matter, Miranda warnings were given Appellant approximately one hour prior to his challenged statement. Appellant was in the same building and only feet away from the room in which he had been interrogated. Further, Appellant was accompanied by the same officer who had given the warnings. Under the circumstances presented we have no hesitation in finding that the Miranda warnings given to Appellant had not become stale so as to require their repetition and that the trial court correctly denied suppression to Appellant's Bradford County statement. *See also Commonwealth v. Ferguson,* 444 Pa. 478, 282 A.2d 378 (1971) (Miranda warnings given seven and a half and three hours prior to new interrogation of a sixteen-year-old held sufficient.) *Commonwealth v. Jones,* 478 Pa. 172, 386 A.2d 495 (1978) (warnings given three hours before statement, in the same room and in the presence of the same officer, held sufficient.)

## 2. *Suppression of DNA Evidence and Denial of Continuance Request*

Because the next two allegations of Appellant are logically and factually intertwined, we will consider them together. Appellant claims that the trial court erred when it denied his motion to suppress DNA evidence and also erred when it denied his request for a continuance to conduct additional DNA testing. We begin with a discussion of the denial of the trial court of the continuance requested by Appellant.

Appellant's trial was scheduled to begin in March of 1996. In February of 1996, he moved for a continuance and a hearing was held on the motion on March 5, 1996. At the hearing the defense asserted that it need a continuance so that defense counsel could travel to Arkansas to interview prospective witnesses personally, and that it needed an additional four to seven weeks so that the most "complete" type of DNA testing could be done on semen found on Regina's body, and on the blood of the Appellant, Curley and Kirk to determine the source of the semen.[20] At the hearing the Commonwealth opposed the motion, arguing that the Appellant had sufficient preparation time, and that it had already scheduled a renowned forensic pathologist, Isidore Mihalakis, M.D., who had performed autopsies on Regina and Austin, to testify at the March trial. The Commonwealth also noted that it had rearranged police schedules so that approximately twenty-seven police officers would be available to testify at trial. The trial court denied the continuance and Appellant now claims that the ruling relating to the continuance mandates the grant of a new trial.

▮▮▮▮▮ The denial of a continuance by the trial judge constitutes reversible error only if there has been an abuse of discretion. *Commonwealth v. Auker*, 545 Pa. 521, 542, 681 A.2d 1305, 1316–17 (1996). "In reviewing the denial of a continuance, we have regard for the orderly administration of justice as well as the right of a criminal defendant to have adequate time to prepare his defense." *Commonwealth v. Crews*, 536 Pa. 508, 640 A.2d 395, 403 (1994) (denial of mid-trial continuance request to conduct independent testing of DNA samples not abuse of discretion in that a lengthy continuance would have exposed jurors to publicity surrounding the trial.) "In a criminal case the appellate court should look to the nature of the crime and the surrounding circumstances to

20. We note that the Commonwealth did have DNA testing done which revealed that Curley and Kirk could not have been the source of the semen but that Appellant could have been. This is not surprising in that witness Ramsey testified that Appellant and Regina Clark regularly engaged in consensual sexual relations. *See* N.T. Vol. XIII, p. 75, Vol. XV, p. 54.

determine if the denial of a continuance was an abuse of discretion." *Commonwealth v. Simmons,* 541 Pa. 211, 241, 662 A.2d 621, 636 (1995), *cert. denied,* 516 U.S. 1128, 116 S.Ct. 945, 133 L.Ed.2d 870 (1996). Under the circumstances of the instant matter, we find that the trial court did not abuse its discretion when it denied Appellant's continuance request. As the trial court explained its decision, "[t]he glaring weakness of [Appellant's] motion for a continuance for purposes of DNA testing was that there was no factual basis for the belief that the semen came from either Curley or Schrader. [Appellant's] suggestion that either Curley or Schrader, or both, may have had sexual relations with Clark and then murdered her to prevent her from telling [Appellant] is a theory in search of facts. There is no evidence whatsoever that Clark had sexual relations with anyone other than [Appellant]." Trial court opinion at 7–8. Since Appellant has failed to demonstrate that the trial court abused its discretion by this ruling, Appellant is entitled to no relief on this claim.

Appellant also challenges the denial of the trial court of his motion to suppress the results of the DNA tests performed by the Commonwealth. Appellant claims that since his continuance motion was not granted, the suppression of the DNA evidence was the appropriate form of relief. Appellant claims that it was the actions and delay of the Commonwealth, particularly the District Attorney, that prevented him from timely receiving the evidence and impeded him from performing his own DNA testing. While captioned a "suppression" claim, the question is whether the trial court should have permitted the introduction of the DNA evidence, offered by Lisa Grossweiler (Grossweiler), a staff molecular biologist at Cellmark Diagnostics in Germantown, Maryland. Grossweiler testified that both Kirk and Curley were excluded from being the source of the semen found in the body of Regina and on her blue jeans. Also, Grossweiler testified that the DNA testing performed did not exclude the Appellant from being the source of the semen. N.T. Vol. XVII, p. 43.

We first note that evidentiary rulings are committed to the sound discretion of the trial court and will not be

disturbed on appeal absent a clear abuse of that discretion. *Commonwealth v. May,* 540 Pa. 237, 253, 656 A.2d 1335, 1344 (1995). Admissibility of evidence depends on relevance and probative value. *Commonwealth v. Hawk,* 551 Pa. 71, 709 A.2d 373 (1998). In *Commonwealth v. Crews,* 536 Pa. 508, 640 A.2d 395, 403 (1994), this Court held that evidence of DNA testing was admissible in a criminal trial, after finding that the scientific processes carried out in a laboratory to compare DNA samples had become routine and were fully accepted in the scientific community. Likewise, in the instant matter, we do not believe that the trial court abused its discretion in admitting this evidence.

 Furthermore, even if we were to decide that the DNA evidence should not have been admitted, Appellant still would not be entitled to the relief he seeks in that erroneously admitted evidence that is merely cumulative of other untainted evidence is harmless error. *Commonwealth v. May,* 540 Pa. at 252, 656 A.2d at 1343. Since the evidence was merely cumulative of the testimony of Ramsey as to the consensual sexual relationship between Appellant and Regina, Appellant is entitled to no relief on this claim.

## C. *Trial Issues*

### 1. *Seating of Jury Panel*

In this allegation of trial error, Appellant claims that the trial court erred in refusing to remove a juror who was a relative of Appellant's co-defendant Curley, and also erred in refusing to further colloquy and remove a juror who, during voir dire, indicated that he did not know if he could be a fair and attentive juror given the length of the trial and its impact on his finances.

 Turning to Appellant's first allegation, April 8, 1996, was the tenth day of testimony in Appellant's trial. On that date, Trooper Julius Rasmus (Trooper Rasmus) was testifying regarding his interview with Appellant at the Camden County Correctional Facility on April 30, 1995. On cross-examination, Trooper Rasmus mentioned that Appellant had

told him that he had last been in the area ten years prior and had stayed with his "dad," Kevin Collins (Mr. Collins).[21] N.T. Vol. XXII, p. 82. The next morning Juror Number 6 informed the court that she knew Mr. Collins. The following examination by the court then occurred in chambers:

Q. Ms. Smith, can you state for the record more precisely how it is that you know the name, Kevin Collins?

A. Kevin Collins is my husband's sister's son.

Q. Okay, do you know Mr. Collins yourself?

A. I have seen him before, but we just haven't had that much to do with him. You know, we just haven't had that much contact with him.

Q. Okay, have you ever met him, been introduced to him?

A. Yeah, I guess, I must have. I get them mixed up, cause there's—he has brothers and I get them mixed up, but—

Q. Okay, do you—have—have you ever had a conversation with him that you know of?

A. Other than just, hello, could have been, you know, something like that.

Q. Okay, do you know—do you know anything about him?

A. No.

Q. Do you know where he works?

A. No.

Q. Do you know where he lives?

A. No.

N.T. Vol. XXIII pp. 1–2. Later in the examination, the witness responded to the court that the relationship would not affect her ability to be a fair and impartial juror. *Id.* at 3. Despite this assurance, defense counsel requested that the juror be removed and replaced with an alternate. The trial court denied this request. Appellant now claims that the

21. In fact, Kevin Collins was the stepfather of witness William Curley. Mr. Collins never testified at Appellant's trial but a stipulation was read into the record that: "First, Kevin Collins is not the defendant's father. Second, Kevin Collins is the step-father of William Curley." N.T. Vol. XXIV, p. 21.

juror should have been removed because of her "significant relationship" with Curley and the fact that after the trial the juror "would have to deal with her husband and at least occasionally with her husband's family." Appellant's brief at 51. We disagree, for it is well established that:

The test for determining whether a prospective juror should be disqualified is whether he is willing and able to eliminate the influence of any scruples and render a verdict according to the evidence, and this is to be determined on the basis of answers to questions and demeanor.... It must be determined whether any biases or prejudices can be put aside on proper instruction of the court.... A challenge for cause should be granted when the prospective juror has such a close relationship, familial, financial, or situational, with the parties, counsel, victims, or witnesses that the court will presume a likelihood of prejudice or demonstrates a likelihood of prejudice by his or her conduct or answers to questions.... *The decision on whether to disqualify is within the discretion of the trial court and will not be reversed in the absence of a palpable abuse of discretion* ....

*Commonwealth v. Wilson,* 543 Pa. 429, 672 A.2d 293, 299 (1996), *cert. denied,* 519 U.S. 951, 117 S.Ct. 364, 136 L.Ed.2d 255 (1996) (emphasis added), (quoting *Commonwealth v. Colson,* 507 Pa. 440, 490 A.2d 811, 818 (1985), *cert. denied,* 476 U.S. 1140, 106 S.Ct. 2245, 90 L.Ed.2d 692 (1986)). In its opinion denying the post-verdict motions of Appellant, the court explained its reasons for denying his motion for removal: "...the juror's relationship to Curley was attenuated. The juror dutifully came forward to disclose the relationship once she became aware of it and she testified credibly that the relationship would not affect her ability to act impartially." Trial Court Opinion at 15–16.

Since it is the trial court that was in the best position to assess the credibility of this juror, *Wilson,* 543 Pa. at 443, 672 A.2d at 300, and since a court may properly refuse to excuse a juror when the trial judge believes that the juror would be fair and impartial, *Commonwealth v. Chambers,* 546

Pa. 370, 392, 685 A.2d 96, 107 (1996), *cert. denied,* 522 U.S. 827, 118 S.Ct. 90, 139 L.Ed.2d 46 (1997), we find no abuse of discretion in the refusal by the trial court to remove Juror Number Six.

In his other juror challenge, Appellant claims that the trial court erred in not replacing a juror who indicated some concern about the length of the trial and its impact on his finances. The trial court characterized the motion as "speculative" and reiterated that a juror's concern for loss of wages is not a sufficient basis for removing that juror. *See Commonwealth v. Fisher,* 545 Pa. 233, 681 A.2d 130 (1996). The trial court did not abuse its discretion in so finding.

### 2. *Psychiatric Evaluation of Witness Ramsey*

During the course of his trial, Appellant requested that Commonwealth witness Ramsey undergo a psychiatric evaluation. This request was denied. Appellant now argues that the perceptions and recollections by Ramsey of the activities of Appellant may have been inaccurate because of her psychiatric instability and/or drug use and that the trial court erred in denying his request for a psychiatric evaluation.

We first note that the determination of testimonial competency rests in the sound discretion of the trial court. *Commonwealth v. Counterman,* 553 Pa. 370, 719 A.2d 284 (1998). We presume a witness is competent, *id.,* and the burden of proving incompetency rests on the party challenging the competency. *Commonwealth v. Goldblum,* 498 Pa. 455, 464, 447 A.2d 234, 239 (1982). In order to be competent to testify a witness must have the ability to (1) perceive an event with a substantial degree of accuracy, (2) remember it and (3) communicate about it intelligibly (4) mindful of his or her duty to tell the truth under oath. *Id.* at 465, 447 A.2d at 239. A trial court has no obligation to order an investigation of the competency of a witness unless the court has some doubt from having observed the witness. *Counterman,* 719 A.2d at 295.

In the instant matter, the trial court denied the motion at trial stating that:

I listened to this witness testify for a long period of time yesterday afternoon in front of the jury. I listened to her testify for better than an hour this morning without a jury. I did not, myself, observe anything, and I mean there was absolutely nothing, that suggested that this witness suffers from any sort of mental or emotional condition that affects her abilities as a witness. Moreover, there is not a centilla (sic) of evidence that would allow me to conclude that this witness is not competent, or that she is impaired or was impaired at any time in her ability to observe, her ability to recall, and her ability to relate events that are relevant to this case.

N.T. Vol. XIV, p. 64. As stated previously, the determination of testimonial competency rests in the sound discretion of the trial court. Clearly, the trial court found this witness competent to testify. When we review the record, we discern absolutely no abuse of discretion in the refusal of the trial court to order that this witness undergo psychiatric evaluation.

### 3. *Evidence of Witness Ramsey's Alleged Drug Use*

Appellant next claims that the defense should have been given more latitude to cross-examine Ramsey about any illegal drug use from the time that the witness met the Appellant (in February or March 1995) to April 18, 1995. Appellant makes little argument on this claim in his brief, merely arguing that the trial court erred in refusing to allow questioning of the witness that did not identify a specific date of the alleged drug use. This claim is without merit because, while a witness may be questioned about drug or alcohol use at the time of the events about which he or she is testifying, questions about a witness's drug use at a time other than the time about which the witness is testifying are not permitted. *See Commonwealth v. Fisher*, 545 Pa. 233, 681 A.2d 130 (1996); *Commonwealth v. Yost*, 478 Pa. 327, 337, 386 A.2d 956, 961 (1978). Accordingly, the trial court did not err and the Appellant is entitled to no relief on this claim.

#### 4. *Alleged Prosecutorial Misconduct*

Next, Appellant challenges three instances of what he characterizes as prosecutorial misconduct. The first occurred on Thursday, April 4, 1996, as testimony was about to begin for the day. Defense counsel was somewhat late for court and the trial court told the tipstaff that counsel had been "out under the rotunda a moment ago." The prosecutor then injected the following statement: "There must have been a reporter out there." N.T. Vol. XIX, p. 1. Defense counsel immediately asked for a mistrial, which the court refused, and now claims that the remark tended to "cheapen the involvement of the defense attorney" and "could have produced passion against the [Appellant]." Appellant's brief at 57. We disagree.

The trial court characterized the comment as "careless" and "improper" but also noted that it was made "lightheartedly and in jest." Trial court opinion at 40. Even if we were to characterize the remark as improper, this does not necessarily entitle Appellant to a new trial. It is well settled that comments by a prosecutor do not constitute reversible error "unless the unavoidable effect of such comments would be to prejudice the jury, forming in their minds a fixed bias and hostility toward the defendant such that they could not weigh the evidence objectively and render a true verdict." *Commonwealth v. Copenhefer,* 553 Pa. 285, 719 A.2d 242, 257 (1998). The prosecutor's attempt at levity certainly did not have the unavoidable effect of so prejudicing the jury.

Appellant's next claim of prosecutorial misconduct occurred later that same day when the prosecutor commented that Appellant should be "appropriately guarded" while he stood near the jury as a videotape was being played. Defense counsel again asked for a mistrial, which the trial court again denied, and Appellant now argues that the prosecutor's remark suggested that he might harm the jury or public or might take flight. Additionally, Appellant claims, the remark suggested to the jury that he was guilty as charged and, thus, entitles him to a new trial. Again, we must disagree with

Appellant's contention that the comment was of such magnitude that a new trial was required. While the comment *may have been uncalled for*, we simply do not find it objectionable enough to find that it had an unavoidable effect that would form in the minds of the jury a fixed bias and hostility toward the Appellant so that the jury would abandon its responsibility and be unable to weigh the evidence objectively and arrive at a true verdict.[22]

In his last claim of prosecutorial misconduct, Appellant argues that during the prosecutor's closing argument he indicated he did not believe the Appellant and called him a liar. *See* N.T. Vol. XXVI, pp. 10, 33, 40.

We agree with Appellant that it is improper for a prosecutor to express a personal opinion as to a defendant's guilt or the credibility of a defendant or other witnesses. *Commonwealth v. Hawkins*, 549 Pa. 352, 389, 701 A.2d 492, 510 (1997), *cert. denied*, 523 U.S. 1083, 118 S.Ct. 1535, 140 L.Ed.2d 685 (1998). However, the prosecutor is permitted to respond to defense arguments and is free to present his or her case with logical force and vigor. *Commonwealth v. Brown*, 551 Pa. 465, 711 A.2d 444, 454 (Pa.1998). Moreover, this Court has held that a prosecutor's comments stating that a defendant had lied were neither unfair nor prejudicial when given in response to the comments of defense counsel in relation to the credibility of witnesses, and when they were supported by the evidence. *Commonwealth v. Johnson*, 527 Pa. 118, 123, 588 A.2d 1303, 1305 (1991). A review of the record reveals that this is precisely what occurred in the instant action and, accordingly, this claim provides Appellant no relief.[23]

**22.** The trial court, in its opinion denying Appellant's post-verdict motions, suggested a second possible interpretation of the challenged language. Earlier in the trial, Regina's sister had attacked the Appellant as he sat at the defense table. The court posited that the jury could have construed the prosecutor's comment as suggesting a guard for Appellant's protection.

**23.** We note that at no point did the prosecutor ever state that "in his opinion" the Appellant had lied.

### 5. *Jury Instructions*

In his next claim of error, Appellant presents a claim that requires little discussion. While admitting that the jury instructions given by the court were accurate statements of the law, Appellant nevertheless claims that the jury did not understand them. Appellant offers absolutely no support for this supposition, bases the claim on no evidence, and, as the trial court mentioned, offers no solution regarding how the instructions could have been improved. Consistent with such circumstances, Appellant is entitled to no relief on this undeveloped claim. *See Commonwealth v. Blount*, 538 Pa. 156, 174, 647 A.2d 199, 209 (1994) (fact that Appellant may believe that further explanation by the court would be beneficial does not render charge defective.)

### 6. *Miscellaneous Evidentiary Issues*

Next, Appellant challenges a number of the evidentiary rulings of the trial court. First, he complains that the trial court improperly limited testimony from witness Mack that Regina told her that she willingly left Arkansas with Appellant. This claim is without merit. The testimony Appellant wished to offer was irrelevant and also would have constituted inadmissible hearsay.[24]

Appellant next claims that the court erred in admitting at trial the entirety of witness Curley's statement, given while he was in custody in North Carolina. Appellant supports this argument by claiming that the length and detail of the statement gave it a status that it did not deserve. Again, we must disagree.

Curley was the principal Commonwealth witness against the Appellant. On cross-examination, Appellant's attorney vigorously attempted to discredit Curley. The trial court then permitted the Commonwealth to rehabilitate its witness by allowing nearly the entirety of his North Carolina

---

24. The classic definition of hearsay is an out-of-court utterance offered to prove the truth of the matter asserted. *Commonwealth v. Carpenter*, 555 Pa. 434, 725 A.2d 154, 165 (1999).

confession to be read into the record. Because a prior consistent statement is admissible to rebut an allegation of corrupt motive or recent fabrication by the witness, *Commonwealth v. Counterman*, 719 A.2d at 301–02, the admission of the statement was not error.

■ Appellant next challenges the admission of evidence given by Curley and his sister Lea Curley (Lea) regarding Appellant's threat, some years previously, to kidnap Lea. Appellant also objects to the admission of evidence by Lea that Appellant had told her that he was a hit man and also spoke about killing Curley's stepfather. Appellant claims that this evidence served only to blacken his character in the eyes of the jury and had limited probative value.[25] We do not agree and we say again that evidentiary rulings are committed to the sound discretion of the trial court and we will not disturb these rulings on appeal absent a clear abuse of that discretion. *Commonwealth v. Johnson*, 727 A.2d 1089, 1102 (Pa.1999). The trial court permitted the admission of this evidence to show why Curley feared Appellant. In its opinion denying post-trial motions the court succinctly explained its reasoning: "The evidence of [Appellant's] prior kidnapping threat, coupled with evidence that Curley had for many years heard [Appellant] brag that he was a "hit man" for the CIA and the mafia, was relevant to prove that Curley had come to believe that [Appellant] was a dangerous person whose commands were not to be ignored." Trial Court opinion at 24–25. We agree that the challenged evidence was relevant [26] for this purpose and find that the trial court did not abuse its discretion in making its evidentiary rulings.[27]

**25.** Again, Appellant has cited absolutely no caselaw in support of these claims of error.

**26.** Evidence is relevant is it logically tends to establish a material fact or if it tends to make a fact at issue more or less probable, or if it supports a reasonable inference or presumption regarding the existence of a material fact. *Commonwealth v. Johnson*, 727 A.2d at 1102.

**27.** We also note that the trial court gave a limiting instruction during Lea Curley's testimony that the evidence was not to be considered by them with respect to whether Appellant actually was a hit man but only to explain what may have been in the mind of William Curley. N.T.

### D. *Sentencing Issues*

#### 1. *Constitutional Challenges*

Next, Appellant claims that the Pennsylvania death penalty statute violates the equal protection and due process clauses of the United States Constitution, Article 1, Section 9 of the Pennsylvania Constitution and Article 3, Section 32 of the Pennsylvania Constitution. Appellant's single argument, under all of these provisions, is that the implementation of the death penalty unconstitutionally limits the ability of an executed defendant to file for collateral relief.

 We first note that "in assessing a punishment selected by a democratically elected legislature against the constitutional measure, we presume its validity." *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 59, 454 A.2d 937, 960 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983), *reh'r denied*, 463 U.S. 1236, 104 S.Ct. 31, 77 L.Ed.2d 1452 (1983). We further note that Pennsylvania's death penalty statute has survived numerous prior constitutional challenges. *See for example: Commonwealth v. DeHart*, 512 Pa. 235, 516 A.2d 656 (1986), *cert. denied*, 483 U.S. 1010, 107 S.Ct. 3241, 97 L.Ed.2d 746 (1987). In *Commonwealth v. Zettlemoyer, supra*, this Court held that the current death penalty statute was acceptable under both the federal and the state Constitutions. Despite this, Appellant's theory is that application of the penalty would unfairly limit his ability to file for post-conviction collateral relief. While Appellant is correct in that the execution of a prisoner definitively ends his ability to file for collateral relief, what he is essentially arguing is that the death penalty should *never* be imposed. However, our death penalty statute has been found legitimate.[28] Moreover, "[o]ur legislature has painstakingly enacted a comprehensive

Vol. X, p. 17. The court repeated this cautionary instruction during its final charge to the jury. N.T. Vol. XXVII, pp. 16–17.

28. In *Blystone v. Pennsylvania*, 494 U.S. 299, 301, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990), the United States Supreme Court held that the Pennsylvania death penalty statute, and Mr. Blystone's sentence under it, comported with its decisions interpreting the Eighth Amendment to the United States Constitution.

sentencing scheme for imposing the death penalty when certain aggravating circumstances accompany the killing. This decision was reasoned and reasonable, and was within the legislature's prerogative to make." *Commonwealth v. Smith,* 518 Pa. 15, 35, 540 A.2d 246, 256 (1988).

Finally, this Court has recently held that the requirement that any petition seeking relief under the PCRA be filed within one year of final judgment [29] is a constitutional exercise of the legislature's power. *Commonwealth v. Peterkin,* 554 Pa. 547, 722 A.2d 638 (1998). Accordingly, Appellant cannot succeed on this claim.

### 2. *Mitigation Evidence—The Kindness by Appellant to Children*

■ Appellant's next argument is that the trial court impermissibly limited his presentation of mitigating evidence. Before the beginning of the penalty phase, Appellant informed the court that he planned to present evidence that he was "kind to children." Appellant requested an order precluding the Commonwealth from rebutting that testimony by offering *any* evidence of Appellant's character except evidence regarding his kindness to children. The trial court informed Appellant that it would not so limit the Commonwealth, and that the Commonwealth could offer any matter relevant to his character. Appellant claims that, as a result, he chose not to offer evidence of his character at the penalty hearing and claims that the ruling of the court wrongly prohibited from him from presenting this mitigating evidence. We disagree.

■ We first note that Appellant offers no caselaw in support of his novel claim that a defendant, after having been found guilty of first degree murder, can effectively estop the Commonwealth from presenting relevant evidence of his character after the defendant himself offers character evidence. The death penalty statute does not so limit the Commonwealth and we decline to adopt such an unsound standard.[30] We also

---

29. There are certain exceptions to the one-year requirement. See 42 Pa.C.S. § 9545(b)(1).

30. Appellant also claims that the Commonwealth would not have had the right to present evidence of his entire prior criminal record.

reiterate that the court is given the discretion to determine what evidence is relevant and admissible on the question of the sentence to be imposed, *Commonwealth v. Abu–Jamal,* 521 Pa. 188, 212, 555 A.2d 846, 857 (1989), and that the penalty hearing is intended "to serve as part of the 'truth-determining process' to enable the sentencer to discern and apply the facts bearing on the determination of the appropriate sentence." *Id.* at 212–213, 555 A.2d at 858. The legislature has directed that in the sentencing hearing, evidence may be presented as to any matter that the court deems relevant and admissible on the question of the sentence to be imposed. *Id.* The trial court did not abuse its discretion in refusing improperly to limit the Commonwealth as Appellant requested and, accordingly, Appellant is entitled to no relief on this claim.[31]

### 3. *Defense Counsel's Penalty Phase Opening Argument*

42 Pa.C.S. § 9711(d)(16) establishes as an aggravating circumstance that the victim of the murder was a child under 12 years of age. Austin, who Appellant was convicted of murdering, was nine years old when he died. In his opening argument during the penalty hearing, Appellant's counsel made the following statement:

> In regard to Austin, he was a child, but the dignity that was inherent in that child did not come from his age, but from what he was, a human being, and who he was. It would be an insult to that boy to render a death penalty in this case because he was a child. Would we show him any less respect if he was thirteen? Is there really that much of a difference between someone that's nine or someone that's thirteen. And yet that aggravating circumstance turns on the arbitrary age of the victim.

Appellant is incorrect. Evidence of a defendant's prior convictions is always relevant and admissible during the penalty phase. *See Commonwealth v. Rollins,* 525 Pa. 335, 345, 580 A.2d 744, 749 (1990) ("Having placed Appellant's character in issue, the prosecutor would then be free to bring out Appellant's prior convictions although neither were felony convictions.")

**31.** We question just how effective evidence that Appellant was "kind to children" would have been, given that the jury had just convicted Appellant of the senseless murder of a nine-year-old child.

N.T. 4/12/96, p. 15. The Commonwealth immediately object-
ed, which the trial court overruled. The court did however,
give the following instruction to the jury:

> Ladies and Gentlemen of the Jury, I will caution you that
> you may not ignore the law of the Commonwealth with
> respect to consideration of aggravating and mitigating cir-
> cumstances. You must follow the law and I'm going to give
> you more complete instructions about that, following this
> portion of the trial. To the extent that you may have
> understood counsel's argument to suggest that you should
> ignore the law of Pennsylvania, you should disregard such
> plea. You are, however, ultimately entitled to weigh any
> aggravating circumstances that you find, weigh that in the
> balance with any mitigating circumstances that you find and
> you, as the jury, ultimately decide what weight to give to
> those aggravating and mitigating circumstances that you do
> find.

*Id.* at 17–18. Appellant now claims that counsel was not
suggesting that the age of Austin was not an aggravating
factor, but was "merely stating that in determining the weight
to be given this aggravating factor, the jurors should not give
particularly great weight to this factor . . ." Appellant's brief
at 28. He goes on to claim that the instruction precluded him
from receiving a fair sentence, and entitles him to a resentenc-
ing. This challenge to the court's *correct statement* of the law
is utterly without support, utterly without merit and affords
Appellant no relief.

### 4. *"Excessive" Sentences*

 Next, Appellant argues that the sentences imposed
for his noncapital convictions were excessive. In addition to
being convicted of two counts of first degree murder, Appel-
lant was also convicted of two counts of conspiracy to commit
murder, two counts of kidnapping and one count of burglary.
He was sentenced to five to ten years on each conspiracy
count, ten to twenty years on each kidnapping count and five
to ten years for the burglary conviction. We first note that
Pa. R.A.P. 2119(f) provides that an appellant who challenges

the discretionary aspects of his sentence (as Appellant does here) "shall set forth in his brief a concise statement of the reasons relied upon for allowance of appeal ..." Furthermore, 42 Pa.C.S. § 9781(b) provides that allowance of an appeal of the discretionary aspects of a sentence "may be granted at the discretion of the appellate court where it appears that there is a substantial question that the sentence imposed is not appropriate under this chapter." "To demonstrate that a substantial sentencing question exists, a party must articulate reasons why a particular sentence raises doubts that the trial court did not properly consider [the] general guidelines provided by the legislature [in 42 Pa.C.S § 9721]."[32] *Commonwealth v. Saranchak*, 544 Pa. 158, 177, 675 A.2d 268, 277 (1996), *cert. denied*, 519 U.S. 1061, 117 S.Ct. 695, 136 L.Ed.2d 617 (1997).

Appellant does not claim that the sentences imposed exceed the permissible penalty. Instead, he claims that the Court imposed the maximum (legal) sentences and ran them consecutively. Appellant claims that the nonmurder offenses were "not relatively egregious" and that the court sought to "piggyback the egregiousness of the murders on the other offenses." We disagree with Appellant's characterization of the offenses of conspiracy to commit murder and kidnapping as "not egregious." Additionally, Appellant makes no argument, and cites no caselaw in support of this claim. Further, and fatally, he has failed to set forth a substantial question that the sentence was inappropriate, and thus deserving of our review. Accordingly, this claim is denied.

▮▮▮▮▮ Appellant also claims that the court improperly sentenced him for two conspiracies and that there was only one conspiracy to commit two murders. Although he does not expand on this claim in his brief to this Court (and again, cites absolutely no authority for his position) Appellant is apparently relying on Section 903(c) of the Crimes Code, which provides that "[i]f a person conspires to commit a number of

---

**32.** 42 Pa.C.S. § 9721 provides a thorough "outline of considerations to focus the court's deliberations in imposing an appropriate sentence." *Commonwealth v. Saranchak*, 544 Pa. at 177, 675 A.2d at 277.

crimes, he is guilty of only one conspiracy as long as such multiple crimes are the object of the same agreement or continuous conspiratorial relationship." 18 Pa.C.S. § 903(c). In determining whether the evidence presented has established a single or multiple conspiracies, several factors can be considered:

> the number of overt acts in common; the overlap of personnel; the time period during which the alleged acts took place; the similarity in methods of operation; the locations in which the alleged acts took place; the extent to which the purported conspiracies share a common objective; and the degree to which interdependence is needed for the overall operation to succeed.

*Commonwealth v. Davis*, 704 A.2d 650, 654 (Pa.Super.1997), *alloc. denied*, 553 Pa. 704, 719 A.2d 744 (1998), *cert. denied*, — U.S. ——, 119 S.Ct. 559, 142 L.Ed.2d 466 (1998), quoting *Commonwealth v. Savage*, 388 Pa.Super. 561, 566 A.2d 272, 278 (1989). "Nonetheless, the essence of conspiracy remains the agreement [between the parties] to work in concert for one or more criminal purposes." *Commonwealth v. Savage*, 566 A.2d at 277. Reviewing the instant matter pursuant to the above-stated standards, it is clear that the evidence presented was sufficient [33] to support Appellant's two convictions for conspiracy to commit murder; in that the agreement to kill Austin, and thus the conspiracy, did not occur until after the murder of his mother, Regina. *See also Commonwealth v. Troop*, 391 Pa.Super. 613, 571 A.2d 1084 (1990), *alloc. denied*, 526 Pa. 634, 584 A.2d 317 (1990) (evidence sufficient to establish three separate conspiracies to commit robbery when defendant and his accomplices entered into three separate agreements to commit three robberies that occurred within twenty-seven hours between April 11 and April 13, 1988.)

**33.** When reviewing sufficiency of the evidence, an appellate court must view all of the evidence, and the reasonable inferences therefrom, in the light most favorable to the Commonwealth as verdict winner, and must determine if all of the elements of the offense were established beyond a reasonable doubt. *Commonwealth v. Burgos*, 530 Pa. 473, 610 A.2d 11 (1992).

## IV. *STATUTORY REVIEW OF DEATH SENTENCE*

[54] Having addressed each of the stated claims of Appellant, we must also conduct the review mandated by 42 Pa.C.S. § 9711. Section 9711(h)(3) requires this Court to affirm the sentence of death unless we determine that:

(i) the sentence of death was the product of passion, prejudice or any other arbitrary factor; or

(ii) the evidence fails to support the finding of at least one aggravating circumstance specified in subsection (d); or

(iii) the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant.

42 Pa.C.S. § 9711(h)(3).[34] We have independently reviewed the record sent to this Court and have concluded that the sentences imposed were not the product of passion, prejudice or any other arbitrary factor and that the sentences imposed are not disproportionate to those imposed in similar cases. Further, we find that the evidence was sufficient to support the aggravating circumstances found in the murders of both Regina Clark and Austin Hopper. Accordingly, we affirm the verdicts and the sentences of death[35] imposed upon John Joseph Koehler by the Court of Common Pleas of Bradford County and direct the Prothonotary of the Supreme Court of Pennsylvania to transmit the complete record of this case to the Governor of Pennsylvania. 42 Pa.C.S. § 9711(i).

Justices ZAPPALA, NIGRO and SAYLOR concur in the result.

---

**34.** Effective June 25, 1997, the General Assembly repealed proportionality review from the death penalty statute by deleting all of subsection (h)(3)(iii) and a portion of subsection (h)(4) that references proportionality review. Act of June 25, 1997, No. 28, § 1 (Act 28), effective immediately. However, because Appellant's death sentence was imposed before the effective date of the act, he is entitled to proportionality review. *Commonwealth v. Gribble*, 550 Pa. 62, 703 A.2d 426 (1997) *cert. denied*, —— U.S. ——, 119 S.Ct. 519, 142 L.Ed.2d 430 (1998).

**35.** We also affirm the judgment of sentence imposed by the trial court for the noncapital offenses of which Appellant was convicted.